UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA

                                                                 MEMORANDUM AND ORDER
                                                                 23-CR-278 (NRM)

                      -against-

ABU CHOWDHURY,

                    Defendant.

----------------------------------------------------------------x

NINA R. MORRISON, United States District Judge:

      Pending before the Court is Defendant Abu Chowdhury's motion to suppress (1) pretrial identifications and corresponding in-court identifications, and (2) the searches — and fruits of said searches — of two cell phones (his "Blue Phone" and his "Red Phone") seized from Chowdhury during a traffic stop.  The Court has considered the parties' briefs, supplemental letter briefing, the testimony and exhibits presented at a two-day suppression hearing, and the parties' oral arguments.  For the reasons outlined below, Chowdhury's motion is GRANTED in part and DENIED in part.  Specifically, Chowdhury's motion to suppress the complainants' pretrial identifications and corresponding in-court identifications at trial, as well as his motion to suppress the fruits of the search of the Blue Phone is DENIED.  However, Chowdhury's motion to suppress the fruits of the search of the Red Phone is GRANTED.

## FACTS AND PROCEDURAL HISTORY

The Court makes the following findings of fact based on the testimony and evidence presented at a suppression hearing conducted over the course of two days, and on the exhibits offered by both parties. The following recitation of the facts is truncated, and only as long as necessary to give the reader context for the opinion. Additional necessary facts are recounted in the analysis of each individual issue.

### I.    Background Facts

#### a.    FBI Investigation

In May 2023, the NYPD alerted the FBI to the kidnapping of John Doe-2, alleged to have occurred on May 11, 2023, in Queens, NY. June 9, 2023 Warrant Aff., Chowdhury Mot. to Suppress Ex. F ("June 9 Warrant Aff."), ECF No. 279-6 ¶ 6; Aug. 26 Hr'g Tr. 71, 73–75.[1] According to FBI Special Agent Micah Friedman ("Agent Friedman"), John Doe-2 told investigators that the kidnapping occurred on May 11, 2023, after he made plans to meet up with a woman who was a fellow student in an online class. *See* June 9 Warrant Aff. ¶¶ 7–8. According to John Doe-2, when he arrived at the meeting place, he was forced into a minivan by a man he did not know. *Id.* ¶ 9. That van had two other males and the female student inside, and John Doe-2 was beaten and forced to take pills which disoriented him. *Id.* ¶¶ 10–11. He was then brought to a hotel room where the kidnappers called his father and demanded

---

[1] Pincites to the suppression hearing transcript refer to the internal transcript pagination of the transcript; for all other record citations, pincites refer to the pagination generated by the Official Court Electronic Document Filing System ("CM/ECF").

$20,000 in ransom. *Id.* ¶ 14. The kidnappers then assaulted John Doe-2 again and sodomized him with an unknown object. *Id.* ¶ 15. He was then brought to the basement of an abandoned house and bound with duct tape. *Id.* ¶ 17. Two days after his abduction, John Doe-2 chewed through his restraints, escaped from the basement, and called 911 from a nearby house. *Id.* ¶¶ 19–20.

In his interviews with law enforcement, John Doe-2 indicated that one of his kidnappers' last name was "Chowdhury," and that he had referred to himself as the "King of New York." Aug, 26 Hr'g Tr. at 76–78. John Doe-2 identified the female kidnapper as a woman he knew from an online learning program by the first name "Iffat." *Id.* at 76–78, 133, 143.

Based on information provided by John Doe-2 and other evidence — including surveillance video of the street where he reported being abducted, social media records that tied Chowdhury in various ways to the "King of New York" nickname, a photo array during which John Doe-2 identified Chowdhury as one of the kidnappers, and a missing passport complaint report that connected an individual named Iffat Lubna to an individual named Abu Chowdhury, *see id.* at 76, 84 — federal agents came to believe that Iffat Lubna was the female student who had lured John-Doe-2 to the kidnapping and participated in it, and that Defendant Abu Chowdhury was the man who initially abducted John Doe-2 and played a leading role in the kidnapping, *see id.* at 76–84. The agents also came to believe that cellular telephones belonging to Chowdhury likely contained evidence of the crime. *Id.* at 97, 99; June 9 Warrant Aff. ¶¶ 10, 15, 29–34.

3

The FBI case agent, Special Agent Friedman, subsequently coordinated with the NYPD to conduct a surveillance operation of Chowdhury and detain him if he was observed committing any traffic offenses. *Id.* at 86. The admitted and sole purpose of the operation was to permit law enforcement to conduct a warrantless seizure of Chowdhury's cellphone(s). Aug. 26 Hr'g Tr. at 148–49, 156–57, 202–03, 227, 229.

   b. Traffic Stop and Arrest

On May 31, 2023, Abu Chowdhury was arrested in Queens, New York, after he was observed driving a vehicle and running a stop sign. *See* June 9 Warrant Aff. ¶ 22. While he was technically arrested for failing to stop at a stop sign and driving without a license, *see* Aug. 26 Hr'g Tr. at 90, the goal of the arrest was specifically to seize his cell phone(s), *see id.* at 148–49, 229, because the agents' expectation was that "[a]ny property on [Chowdhury] during [the] arrest [would] get[] invoiced." *Id.* at 229.

At the time of the stop, Chowdhury was traveling with his fiancée, Iffat Lubna, in the front passenger seat, and another individual, described by Agent Friedman as a "male minor," in the back seat. June 9 Warrant Aff. ¶ 22; Aug. 26 Hr'g Tr. at 207, 234–35, 276. After observing Chowdhury run a stop sign, NYPD Detective Schiavone, who had been detailed as an FBI Task Force Officer for purposes of this investigation, directed Chowdhury to stop and approached the vehicle with other members of his team. June 9 Warrant Aff. ¶ 22; Aug. 26 Hr'g Tr. at 206–07. Detective Christofer Schiavone already knew that Chowdhury did not have a valid license, Aug. 26 Hr'g Tr. at 202, and that he was currently driving a BMW X5 with plates which were not

4

registered to any vehicle.  June 9 Warrant Aff. ¶¶ 22, 24; Aug. 26 Hr'g Tr. at 209.
Detective Schiavone asked Chowdhury to step out of the vehicle and informed him
that he was under arrest for driving with a suspended license.  June 9 Warrant Aff.
¶ 22; Aug. 26 Hr'g Tr. at 210.

      c.  <u>Seizure of the Phones</u>

Pursuant to Chowdhury's arrest, Detective Schiavone recovered a cell phone
(the "Blue Phone") from Chowdhury's person.  June 9 Warrant Aff. ¶ 22; Aug. 26 Hr'g
Tr. at 210–11, 219, 236.  Lubna exited the vehicle holding two additional cellular
telephones: one she identified as hers, and another which she indicated belonged to
Chowdhury (the "Red Phone"), which had been on top of the center console of the
vehicle.  June 9 Warrant Aff. ¶ 22; Aug. 26 Hr'g Tr. at 89, 91–92, 154.[2]  Upon
Lieutenant Emile Provencher's order, she handed the Red Phone to him.  Aug. 26
Hr'g. Tr. at 155, 277.  Chowdhury then spoke to Lubna in a language other than
English, and Lubna subsequently asked the officers to return the Red Phone.  June
9 Warrant Aff. ¶¶ 22, 24; Aug. 26 Hr'g Tr. at 92.  Chowdhury also requested the
return of his phones after he was taken into NYPD custody.  June 9 Warrant Aff.
¶¶ 25; Aug. 26 Hr'g. Tr. at 157–58.

That evening, police impounded Chowdhury's vehicle, which bore mismatched
plates, and searched its contents.  NYPD BMW Invoice, Gov't. Resp. to Def. Pretrial

---

[2] The record reflects conflicting testimony on this point. While Agent Friedman
testified that Lubna exited the vehicle with two phones, Lt. Provencher asserted at
the suppression hearing that Lubna was still in the car when she handed him the red
phone.  Aug. 26 Hr'g. Tr. at 277. As noted *infra*, the Court credits Agent Friedman's
recollection on this point over Lt. Provencher's.

Mots. ("Gov't Opp.") Ex. 3, ECF No. 303-3; NYPD Inventory Invoice C, Gov't Opp. Ex. 4, ECF No. 303-4; Aug. 26 Hr'g. Tr. at 91, 282. Hours later, the police returned all property recovered to a third party under Chowdhury's authorization, except for Chowdhury's two phones. *See* NYPD Signed Return of Property, Gov't Opp. Ex. 5, ECF No. 303-5; Aug. 26 Hr'g. Tr. at 222–23, 258–59, 280.

Detective Schiavone invoiced both phones at the precinct. NYPD Phones Invoice, Chowdhury Mot. to Suppress Ex. G, ECF No. 279-7. The phones were categorized as "investigatory" property — not inventory. *Id.*; Aug. 26 Hr'g. Tr. at 219, 282. Agent Friedman collected the phones shortly thereafter for FBI inspection. FBI Seizure of Phones, Chowdhury Mot. Ex. H, ECF No. 279-8. When Chowdhury was released from custody that same day, he repeatedly asked for his phones back, and was told that they were mistakenly sent to the Queens property office (which was not true), so they could not be returned that night. Aug. 26 Hr'g Tr. at 157–58.

d. <u>Photo Arrays</u>

On May 22, 2023, Agent Friedman conducted a police-arranged identification procedure in which John Doe-2 was shown six sequential photographs. May 22 Photo Array, Chowdhury Mot. to Suppress Ex. L, ECF No. 279-12; FBI 302A, Chowdhury Mot. to Suppress Ex. I ("FBI 302A"), ECF No. 279-9. John Doe-2 went through the photographs one at a time, and identified Chowdhury as one of his kidnappers. *See* FBI 302A at 2. He was then asked how certain he was of this identification and stated that he was 50% sure. FBI 302A at 2; Aug. 26 Hr'g Tr. at 77–78, 142–43. On June 14, 2023, Detective Schiavone conducted a second identification procedure, again

with six sequential photographs, in which John Doe-1, a complainant in a different alleged kidnapping, identified Chowdhury.  June 14 Photo Array, Chowdhury Mot. to Suppress Ex. M, ECF No. 279-13; FBI 302B, Chowdhury Mot. to Suppress Ex. N ("FBI 302B"), ECF No. 279-14.  The notes from this procedure indicate that John Doe-1 also identified another individual in the array (who was a police-arranged filler, not a suspect) as "look[ing] like one of the other men who had beat him."  FBI 302B at 2.

e. June 9 Search Warrant

On June 9, 2023, Agent Friedman applied for a warrant to search both phones. June 9 Warrant Aff. ¶ 4; Aug. 26 Hr'g Tr. at 97.  The warrant application contained a detailed narrative of the alleged kidnapping, including information about the complainant's relationship with Lubna and the circumstances of the abduction, such as the location, timing, description of the vehicle, and the suspect's appearance.  June 9 Warrant Aff. ¶¶ 6–27.  The affidavit also described the kidnappers' use of cell phones during the kidnapping and John Doe-2's observation that his abductors recorded the crime using a phone.  *Id.* ¶¶ 24–27.

Magistrate Judge Robert M. Levy granted the application and signed the warrant that same day.  June 9 Warrant Aff. at 19; June 9, 2023 Search Warrant, Chowdhury Mot. to Suppress Ex. F, ECF No. 279-6 at 23 ("June 9 Warrant").  The warrant authorized a narrowly time-limited search of the two cell phones, allowing the government to search for records dated May 11–13, 2023, related to the kidnapping and assault allegations, including photographs, videos, text

communications, location data, and evidence of user attribution.  June 9 Warrant Aff. Att. B.

      f.  <u>Search of the Blue Phone</u>

On July 12, 2023, Agent Friedman conducted a manual search of the Blue Phone.  Aug. 26 Hr'g Tr. at 102, 104–05.  According to Agent Friedman, it was his understanding that due to the operating system on that phone, forensic extraction was not possible, and only a manual review was feasible.  Blue Phone Manual Search 302, Gov't Opp'n Ex. 9 ("Blue Phone 302"), ECF No. 302-9 at 2; Aug. 26 Hr'g Tr. at 102.

During Agent Friedman's search of the Blue Phone, he opened the "Photos" application to search for photographs dated within the authorized range.  Blue Phone 302 at 2.  Upon doing so, he observed four photo albums, one of which was entitled "M," which is the first initial of John Doe-1 — the complainant in another alleged kidnapping that Agent Friedman was also investigating.  *Id.*  Agent Friedman did not open the album, but from the thumbnail he observed that it appeared to contain 22 photographs and displayed an image of John Doe-1 in a car with a masked man wearing black gloves.  *Id.*; Aug. 4, 2023 Warrant Aff., Chowdhury Mot. to Suppress Ex. J ("Aug. 4 Warrant Aff."), ECF No. 279-10 ¶ 24; Aug. 26 Hr'g Tr. at 106–07.

Agent Friedman took pictures of the screen that displayed the photo album thumbnails and of phone's home screen.  Blue Phone 302 at 2–3; Aug. 26 Hr'g Tr. 106–08.  In a subsequent warrant affidavit, he reported that the thumbnail image

was observed "in plain view" and appeared to contain evidence of the March 27, 2023 kidnapping of John Doe-1.  Aug. 4 Warrant Aff. ¶ 24.

> g.  August 4 Search Warrant

On August 4, 2023, the government applied for a second judicial warrant to search both phones in a broader date range.  *See generally* Aug. 4 Warrant Aff. Relying on an affidavit from Agent Friedman that referenced the thumbnail image, the warrant authorized a search for data covering March 1–April 27, 2023, as well as May 1–31, 2023.  *Id.* ¶ 24, Att. B.

> h.  Indictments

On July 7, 2023, a grand jury indicted Abu Chowdhury and Iffat Lubna for the kidnapping of John Doe-2 (at that point identified as simply "John Doe"), in violation of 18 U.S.C. § 1201(a)(1).  *See* ECF No. 1.  On January 9, 2024, a superseding indictment added kidnapping and conspiracy to kidnap charges relating to John Doe-1 under U.S.C. § 1201(a)(1) and (c), respectively, as well as five additional defendants. *See* ECF No. 55.  On December 16, 2024, a second superseding indictment added charges for the kidnapping and conspiracy to kidnap a third individual, John Doe-3, under the same statute, as well as one additional defendant.  *See* ECF No. 200.

## II.  Procedural History

On May 30, 2025, Chowdhury filed the instant motion to suppress.  *See* Chowdhury Mot. to Suppress ("Chowdhury Mot."), ECF No. 279.  He asserts that his Fourth Amendment rights were violated in several respects.  First, he contends that the identification procedures (photo arrays) were unconstitutionally suggestive.  *Id.* at 15–20.  Second, he argues that the warrantless seizures of his cell phones were

unlawful. *Id.* at 20–27. Third, he maintains that the government unreasonably waited nine days before seeking judicial authorization to search his phones. *Id.* at 27–30. Fourth, he argues that the June 9 Warrant Affidavit lacked probable cause because it contained only conclusory allegations linking him to the alleged kidnapping of John Doe-2, and because it omitted material information — specifically, that John Doe-2 expressed only 50% certainty in identifying Chowdhury as one of the perpetrators in the photo array. Chowdhury Reply to Gov't Opp. ("Chowdhury Reply"), ECF No. 320, at 29–37. Finally, he claims that the manual review of the Blue Phone[3] exceeded the scope of the June 9, 2023 warrant because the agent unlawfully viewed a thumbnail image outside the authorized date range and used that information to illegally obtain a follow-on warrant. Chowdhury Mot. at 24–27. After the motion was fully briefed, the Court granted the government leave to file a sur-reply to Chowdhury's argument, first advanced in his Reply, that the June 9 Warrant Affidavit lacked probable cause. *See* Gov't Letter re Warrant Validity, ECF No. 335.

The Court held an evidentiary hearing that began on August 26, 2025, at which the government presented four witnesses: FBI Special Agent Friedman, FBI Digital Forensic Examiner Cottone, NYPD Detective Schiavone, and NYPD Lieutenant Provencher. *See* Minute Entry dated Aug. 26, 2025. For the first time at that hearing, the government advanced that the argument that the Red Phone was

---

[3] In his opening brief, Chowdhury mistakenly referred to the manually searched phone as the "Red Phone." *See* Chowdhury Mot. at 12–13. He later corrected this error in his reply. Chowdhury Reply at 37 n.11.

properly seized pursuant to the automobile exception to the warrant requirement. Aug. 26 Hr'g Tr. 29–31. The Court granted the government leave to brief this additional justification. *Id.* at 56, 263. After a full day of testimony, the hearing was continued to September 19, 2025 for additional testimony and oral argument, *see* Minute Entry dated August 26, 2025, which was later rescheduled for September 10, 2025, *see* Docket Order dated August 28, 2025.

The government submitted additional letter briefing on September 4, 2025. *See* Gov't Letter re: Automobile Exception ("Gov't Auto Ltr."), ECF No. 343. In it, for the first time, the government advanced the argument that the Red Phone was properly seized pursuant to the plain view exception to the warrant requirement. *See generally id.* Chowdhury responded on September 8, 2025. *See* Chowdhury Letter re: Automobile Exception ("Chowdhury Auto Ltr."), ECF No. 344.

On September 10, 2025, the Court heard further testimony from Agent Friedman, followed by oral argument. *See* Minute Entry on Sept. 10, 2025. This order GRANTING Chowdhury's motion in part and DENYING it in part follows.

## DISCUSSION

## I.    The Photo Arrays and Corresponding In-Court Identifications

Chowdhury contends that the photo arrays administered to John Doe-2 and John Doe-1 were unduly suggestive and that the Court should suppress any reference to the identifications, as well as any corresponding in-court identifications, as unreliable. Chowdhury Mot. at 15–20. The Court disagrees. The identification procedures used here were not unconstitutionally suggestive, nor otherwise so

11

unreliable as to preclude these witnesses from making in-court identifications at trial.

The Due Process Clause of the Fourteenth Amendment requires that, in determining the admissibility of identification testimony, reliability is the "linchpin." *Manson v. Brathwaite*, 432 U.S. 98, 113–14 (1977). A challenge to a pretrial identification of a defendant triggers either a "one-step or two-step" inquiry for the Court. *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). First, the Court must "determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). If the procedures are not deemed to be unduly suggestive, no further inquiry is required, and "[t]he reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case[,] is a matter for the jury." *Foster v. California*, 394 U.S. 440, 442 n.2 (1969). However, if the pretrial identification procedures are deemed unduly suggestive, the Court "must then determine whether the [witness's] identification [i]s nonetheless independently reliable" and may be offered at trial. *Raheem*, 257 F.3d at 133.

"The fairness of a photographic array depends on a number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents." *Maldonado-Rivera*, 922 F.2d at 974. If the manner of presentation from law enforcement is not deemed unduly suggestive, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that that

12

person was more likely to be the culprit." *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal quotation marks omitted and alterations adopted). One manner in which a picture could stand out is if it is the only one that matches the description given of the suspect, as "[o]ne would think that if a suspect is described only in terms of one characteristic, the filler photos in an array would also portray people having that characteristic." *United States v. Eltayib*, 88 F.3d 157, 166 (2d Cir. 1996). For instance, the Second Circuit has found an array to be impermissibly suggestive when the defendant's photo was the only one in the array that "remotely resemble[d]" his skin color. *United States v. Fernandez*, 456 F.2d 638, 642 (2d Cir. 1972).[4]

Chowdhury argues that because the photo arrays "included arrest dates, police logos, and 'mugshot' links," they invariably would leave any viewer with the impression that "the individuals depicted in the photographs were 'criminals.'"

---

[4] Chowdhury requested the Court hold a hearing to identify if any procedures in administering the photo arrays were unduly suggestive. Chowdhury Mot. at 19–20 (citing *United States v. Tang Yuk*, 885 F.3d 57, 77 (2d Cir. 2018) (noting that an evidentiary hearing is appropriate when "the moving papers are sufficiently definite, specific, detailed and nonconjectural")). However, there is no "*per se* rule compelling" a hearing examining the suggestiveness of a pretrial identification, *i.e.*, a hearing under *United States v. Wade*, 388 U.S. 218 (1967). *Watkins v. Sowders*, 449 U.S. 341, 349 (1981). "The purpose of a *Wade* hearing is to determine before the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." *United States v. Gershman*, 31 F.4th 80, 92–93 (2d Cir. 2022). This hearing is required only when "a defendant . . . allege[s] facts supporting his contention that the identification procedures used were impermissibly suggestive." *United States v. Williams*, No. 13-cr-580 (JMF), 2014 WL 144920, at *1 (S.D.N.Y. Jan. 15, 2014) (internal quotation marks omitted). In this case, Chowdhury has presented no evidence besides pure conjecture that any procedures employed in administering the photo arrays were unduly suggestive. This Court "need not grant a *Wade* hearing based on pure speculation," and declines to do so in this case. *United States v. Bracy*, No. 20-cr-483 (ARR), 2022 WL 17801133, at *2 (E.D.N.Y. Dec. 19, 2022).

Chowdhury Mot. at 17.  Additionally, in the June 14 photo array, Chowdhury's "arrest date" was the most recent one, setting him apart from the others.  *Id.* at 18.

The Court has independently reviewed the six-page photo arrays and does not find that they were unduly suggestive.  *See* Photo Arrays, Chowdhury Mot. to Suppress Ex. L–M, ECF Nos. 279-12, 279-13.  Each page has a large in-color picture of an individual in the center.  The top of the page has a "New York City Police Department" title, along with the NYPD shield in both top corners.  Below each picture to the left, in what appears to be no larger than 12-point font, is an NYSID number and an arrest number.  Below each picture to the right, in the same font, is an arrest date.  At the very bottom of the page, where a footer would generally be found, is a web link that begins with "https://mugimage.nypd.finest."  Each photo is of a man with a full head of black or brown hair and a full beard.  No individual appears to be of an obviously different skin tone than any other, and they all have either dark brown or black eyes.  None of the individuals are wearing particularly distinctive clothing.  *See generally id.*

It is clear from the images that they are mugshots.  Thus, Chowdhury is correct that any viewer would most likely assume that each of the individuals in the array had at some point in the past been arrested.  However, this Court is unaware of any court that has found that the simple fact that a photo array consisted of mugshots — imputing potential criminality on all six individuals, including police-arranged "fillers" — was unduly suggestive.  Instead, courts have focused on whether the *differences* in the identifying mug shots' placards or captions were unduly suggestive.

14

*See, e.g.*, *United States v. Concepcion*, 983 F.2d 369, 378 (2d Cir. 1992) (finding that "[a]n array is not unduly suggestive merely because legends on the pictures reveal that the defendant was arrested in one borough and the other persons were arrested in another," though finding the admission of identification testimony was in error on other grounds); *United States v. Restrepo*, 1-cr-1113 (SAS), 2002 WL 10455, at *4 (S.D.N.Y. Jan. 3, 2002) (noting that the argument that eight photographs which displayed different counties of arrest was "somehow suggestive has been soundly rejected by the Second Circuit"); *United States v. Luguis*, 166 F. Supp. 2d 776, 781 (S.D.N.Y. 2001) (rejecting the argument that a lineup was unduly suggestive because ten of the fifteen subjects wore identification tags suggesting they had been arrested).

Chowdhury relies on *United States v. Archibald*, 734 F.2d 938 (2d Cir. 1984), for the proposition that the Second Circuit has warned that "the use of captioned photographs . . . surely was poor prosecutorial practice." *See* Chowdhury Mot. at 43–44 *(*quoting *Archibald*, 734 F.2d at 940). Putting aside the fact that *Archibald* clearly held that the use of captions was *not* constitutional error, 734 F.2d at 940, Chowdhury's reliance on the case is misplaced. The defendant's claim in *Archibald* was not that the photo spread contained mugshots at all, but that the captions identified the specific borough of arrest, and the defendant's caption "identified him with criminality in Manhattan," whereas there were different boroughs listed on the other mugshots. *Id.* (internal quotation marks omitted). Thus, when the Circuit indicated that "[i]t would have been a simple matter to cut out the identifying captions," it appears to be referring to the identification of the borough of arrest, not

15

the identification of the picture as a mugshot itself. *Id.* Thus, this Court cannot conclude that the fact that all six subjects in the photo array were depicted through images readily identifiable as mugshots was unduly suggestive of Chowdhury's identification, let alone in an unconstitutional manner.

This brings the Court to Chowdhury's argument that, in the June 14 photo array, Chowdhury's arrest photo had a caption with the date of arrest, and it was the most recent arrest date "by over two months" as compared to the others. Chowdhury Mot. at 18. From a review of the photos, and given the size and placement of the arrest date under the photograph, the Court disagrees with Chowdhury's contention that this "recent arrest date is even more suggestive of criminality tha[n] a prominent physical feature." *Id.* Rather, this date is more akin to a listing of a borough of arrest, where the suspect's borough is different from the others in the line-up. This Court does agree with the *Archibald* court that it would have been a simple task to remove the arrest dates from the lineup (among other reasons, to prevent any claim by the defense of undue suggestion), and it was certainly poor practice not to do so, even if the Second Circuit has found that it was not constitutional error. [5]

---

[5] Chowdhury also argues that the arrays were unduly suggestive because they were not conducted pursuant to a double-blind procedure — that is, one in which the administrators do not know the identity of the suspect. Chowdhury Mot. at 16. Chowdhury is correct that there is a significant body of research, as well as a growing number of judicial decisions, finding that administering a photo array double-blind is far more likely to reduce the risk of a suggestive and/or erroneous identification. *See, e.g.*, *Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th Cir. 2015) ("Without the double-blind procedure, there is an avoidable risk that the administering officer will inadvertently provide cues to the witness before, during, or after the viewing."); Melissa B. Russano, et. al., *"Why Don't You Take Another Look at Number Three?":*

As the pretrial identification procedures were not unduly suggestive, the Court need not proceed to step two and analyze whether these witnesses' identifications of Chowdhury are independently reliable. *See Jarrett*, 802 F.2d at 42 ("[I]f the procedures were not impermissibly suggestive, independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury." (internal citations omitted)). As such, the Court denies Chowdhury's motion to suppress John Doe-1 and John Doe-2's out-of-court and in-court identifications.

---

*Investigator Knowledge and its Effects on Eyewitness Confidence and Identification Decisions*, 4 Cardozo Pub. L. Pol'y & Ethics J. 355, 368 (2006) (discussing a study where "participants were more likely to falsely identify the suspect" under "single-blind" conditions than "double-blind" conditions).

However, this Court is not aware of any court that has held a single-blind photo array to be so unduly suggestive on its own as to warrant suppression of the identification. That is particularly so where, as here, the administrators did use another practice that has been shown to reduce the risk of misidentification: sequential administration of the photo array. *See, e.g.*, Nancy K. Steblay, Jennifer E. Dysart & Gary L. Wells, *Seventy-Two Tests of the Sequential Superiority Effect: A Meta-Analysis and Policy Discussion*, 17 Psychology, Public Policy and Law, 99 (2011) *available at* https://psycnet.apa.org/doiLanding?doi=10.1037%2Fa0021650). Other courts in this circuit have found that, standing on its own, the lack of a double-blind procedure is not so unduly suggestive as to warrant suppression. *See, e.g.*, *United States v. Schaffer*, No. 12-cr-430 (ARR), 2014 WL 1515799, at *7 (E.D.N.Y. Apr. 18, 2014) (noting that a single-blind simultaneous photo array was "not considered inherently suggestive under the law applicable in this circuit"); *Marquez v. Dougherty*, No. 19-cv-962 (SVN), 2022 WL 4467020, at *8 (D. Conn. Sept. 26, 2022) (noting that "courts in this Circuit have declined to invalidate identification procedures because they were not double blind"). In this instance, where the Court has not found any other evidence of undue suggestiveness, it declines to find that the lack of a double-blind procedure alone rendered the identification procedure unconstitutionally suggestive.

17

## II.    Seizures of the Cell Phones

It is undisputed that Chowdhury's two cell phones were (1) seized without a warrant, and (2) held for nine days after their initial seizure — and his release from custody — until Agent Friedman finally applied for and obtained a warrant to search the phones' data.    But the parties vigorously dispute whether any recognized exception(s) to the warrant requirement justified these seizures.

"Warrantless searches and seizures are 'per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  As such, "the burden is on the government to establish that the search or seizure fits within one of the exceptions to the warrant requirement." *United States v. Haskins*, 21-cr-269 (PKC), 2022 WL 1460277, at *7 (E.D.N.Y. May 9, 2022).

The government advances multiple exceptions to the warrant requirement to justify their warrantless seizures of and continued retention of Chowdhury's Blue and Red Cell Phones.  Before turning to those specific exceptions, the Court will first address one overarching issue that impacts much of its analysis: whether and when the agents had probable cause to seize these devices.  Specifically, the Court considers whether (and if so, when) the government had probable cause to believe that (1) Abu Chowdhury was one of the perpetrators of the kidnapping of John Doe-2, and (2) Chowdhury's cell phones contained evidence of that crime.

18

a. <u>Probable Cause</u>

The government argues that, by the time of the traffic stop on May 31, 2023, "law enforcement had probable cause to believe that Abu Chowdhury was involved in the kidnapping of John Doe-2[,] [and] that phones belonging to Abu Chowdhury would contain evidence of a crime." Gov't Auto. Ltr. at 3. Chowdhury, on the other hand, contends that on May 31, 2023, not only was there not probable cause that evidence of a crime would be found on the phones, but also that there was insufficient evidence "to establish to a fair probability that . . . Chowdhury was the perpetrator" of the kidnapping. Chowdhury Auto. Ltr. at 8. This Court agrees with the government that, as of May 31, 2023, law enforcement had probable cause to believe that Chowdhury had committed the kidnapping of John Doe-2 and that his phones would contain evidence of that crime.

Probable cause exists when all the available facts, "viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013). While it requires more than a generalized suspicion, it does *not* require that that the evidence, viewed in "the totality of the circumstances," *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983), shows that the likelihood of finding evidence of criminal activity is more likely than not, but only that there is a "probability or substantial chance of criminal activity," *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990).

Probable cause to search a suspect's electronic device further requires the government to show some specific "nexus between the alleged crimes and the [device]

19

to be searched." *United States v. Silva*, 146 F.4th 183, 190 (2d Cir. 2025).  However, that "nexus" can be "based upon a reasonable inference from the facts presented," as well as "an officer's experience" and "common sense."  *Id.* (internal quotation marks omitted).

The evidence Agent Friedman had available to him at the time of the vehicle stop was enough to establish probable cause that Chowdhury was involved in the kidnapping of John Doe-2.  At the August 26 hearing, Agent Friedman outlined the following.  In an initial interview with the NYPD, which occurred prior to the seizure of the cell phones, John Doe-2 said that one of his kidnappers' last names was Chowdhury.  Aug. 26 Tr. at 76.  As Friedman acknowledged, Chowdhury is a very common name in the Bangladeshi community, *id.* at 133; however, that kidnapper also referred to himself as "the King of New York," *id.* at 76.  John Doe-2 also told law enforcement that one of the kidnappers was named Iffat.  *Id.* at 77.  John Doe-2 then "provide[d] Iffat's school [Microsoft] Teams user name, [and said she was] the woman he had been conversing with" in the online educational program they both attended, which led investigators to her full name: Iffat Ara Haque Lubna.  *Id.* at 79.  Agent Friedman then testified that someone filed a complaint in April on Lubna's behalf regarding her lost passport, and the person listed on the complaint was Abu Chowdhury, who further indicated he had the same address as Lubna.  *Id.*

And there was more.  Upon review of Chowdhury's social media accounts, Agent Friedman found that his Instagram handle had the term "KingofNYC" in it, Aug. Hr'g Tr. at 76, that he used a CashApp account with the name "King," *Id.* at 76–

20

77, and that he had "a SnapChat [account] using some variety of King of NYC," *id.* at 77. Additionally, Friedman reviewed surveillance video of the initial abduction. Although the video was not of sufficient quality to determine "for [one] hundred percent sure that" the perpetrator of the abduction was Abu Chowdhury, *id.* at 82–83, Agent Friedman concluded that the subject's "build, his facial hair, [and] his haircut," *id.* at 83, were consistent with Abu Chowdhury's DMV records, criminal history records, and social media, *id.* at 76. The surveillance video also showed that the kidnappers used a white BMW X5 SUV, and Agent Friedman knew that Chowdhury had registered to him a white BMW SUV, which was also in his social media photos. *Id.*

In addition, on May 22, 2023, John Doe-2 participated in a photo line-up, discussed *supra*, in which he identified a photo of Abu Chowdhury as the "King of New York" kidnapper, and stated that he was 50% certain of that identification. *Id.* at 77; FBI 302A at 2. He also identified a photograph of Lubna as the female kidnapper, and stated that he was 40 percent certain in that identification. Aug. 26 Hr'g Tr. at 143; FBI 302A at 3.

Chowdhury does not dispute that John Doe-2's statements provided probable cause to believe that a kidnapping had been committed; instead, he argues that what was known to the agents as of May 31, 2023 simply did not provide probable cause that *Chowdhury himself* was one of the perpetrators. *See* Chowdhury Auto. Ltr. at 6–7. He points out that surveillance video in which only the kidnapper's build but not face is identifiable cannot provide the requisite probable cause that it is him on

21

the video. *Id.* at 6. He argues that that because the video did not get the license of the BMW SUV, the fact that the car looked the same as one Chowdhury owned "is too generic to establish probable cause." *Id.* at 7 (citing *United States v. Patterson*, 25 F.4th 123, 131 (2d Cir. 2022) (noting that a similar make, model, and color of a car seen near a crime was insufficient to establish probable cause)). He asserts that "King of New York" is a "fairly common online moniker," and these connections to Lubna showed only that they were "acquaintances," not that he was involved in the kidnapping. *Id.* Lastly, he contends that the 50- and 40-percent-confidence identifications do not amount to probable cause against Chowdhury, and "[i]f Ms. Lubna's identification is uncertain, then her connection to Mr. Chowdhury cannot meaningfully strengthen probable cause against him." *Id.* at 7–8.

In determining whether probable cause that Chowdhury was involved in the kidnapping existed on May 31, 2023, this Court may not view each piece of information known to investigators in isolation. It must perform a "totality-of-the-circumstances analysis." *Gates*, 462 U.S. at 238; *see also Harris*, 569 U.S. at 244 (explaining that probable cause is a "practical," "common-sensical" and "all-things-considered" standard). To put it another way, probable cause exists where there are "sufficient facts to establish the sort of fair probability on which reasonable and prudent [people], not legal technicians, act." *United States v. Lauria*, 70 F.4th 106, 129 (2d Cir. 2023) (internal quotation marks omitted). Here, even assuming *arguendo* that no one fact Agent Friedman relied upon was enough to establish probable cause, this Court has no trouble finding that a 50-percent-confidence

identification from John Doe-2 — combined with the facts that the kidnapper had the same legal last name *and* variations on the same nickname that Chowdhury used across various social media platforms, his car appeared to be the same make and color as the kidnapper's, he had a similar build and facial hair, and he was close enough to the complainant's fellow student and suspected female kidnapper (named as "Iffat," later identified through school records as Lubna) to file a complaint for her missing passport and list their shared home address — was sufficient for Agent Friedman to conclude that there was, at the very least, a "probability or substantial chance" that Chowdhury was involved in the kidnapping of John Doe-2. *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990).

Chowdhury next argues that, even if there was probable cause that he was involved in the kidnapping of John Doe-2, law enforcement lacked any evidence that could lead them to believe there was probable cause that his cell phones contained evidence of that crime. Chowdhury Auto. Ltr. at 4–6.[6] While this presents a far closer question, the Court concludes that there was probable cause to believe that evidence of John Doe-2's kidnapping would be found on Chowdhury's phones at the time they stopped Chowdhury for driving infractions on May 31, 2023.

Importantly, "probable cause to arrest a suspect does not necessarily amount to probable cause to search his cell phone" because "specific, factual allegations that

---

[6] Chowdhury specifically argues that there was no basis for probable cause that the Red Phone contained evidence of criminal activity — though he does not concede that there was a basis for the Blue Phone. In this section, the Court simply explains its reasoning as to why there was probable cause that any phone owned by Chowdhury had evidence of criminal activity on it.

tend to link the alleged criminal conduct to the" phone must be established. *Silva*, 146 F.4th at 190. However, there were specific, factual allegations known to law enforcement that support that finding here. First, John Doe-2 told Agent Friedman that at times during the kidnapping, as he was being assaulted, he saw one of the perpetrators "holding a cellular telephone in his hand, with the camera pointed at him, recording the assault." June 9 Warrant Aff. ¶ 15; Sept. 10 Hr'g Tr. at 327–28.[7] Agent Friedman also wrote in the June 9 Warrant Affidavit that, based on his training and experience, cell phones are often used in the course of planning or executing a kidnapping as perpetrators "may communicate through text messages, emails, or social media" and that they may also "store photographs or videos [related to the kidnapping] on their cellular telephones." June 9 Warrant Aff. ¶ 28.

Chowdhury argues that John Doe-2's account to Agent Friedman that one of the kidnappers filmed him with a cell phone is unreliable hearsay with "no

---

[7] In the June 9 Warrant Affidavit, Agent Friedman attested that John Doe-2 saw Chowdhury filming the kidnapping and assault with his phone. June 9 Warrant Aff. ¶ 15. However, at the September 10 evidentiary hearing, it came to light that Agent Friedman's notes of his May 19 interview with John Doe-2, which he conducted while John Doe-2 was still in a hospital bed, Sept. 10 Hr'g Tr. at 330, did not indicate that Chowdhury filmed the incident with his phone, *id.* at 334–35. Rather, Agent Friedman's notes simply indicate that John Doe-2 told him that "the kidnappers" recorded videos, *id.*, and did not name Chowdhury as the individual who held the camera.

Based on the facts that came out at the hearing, the Court cannot credit the June 9 Warrant Affidavit's assertion that John Doe-2 "saw Chowdhury holding a cellular telephone" and filming him. June 9 Warrant Aff. ¶ 15. However, the Court concludes that Agent Friedman's inclusion of this fact in the Warrant Affidavit was an inadvertent error. Thus, the Court does find that, as of the May 31, 2023 traffic stop, John Doe-2 had reported to law enforcement that at least one of his kidnappers had filmed him with a cell phone, even if not Abu Chowdhury specifically.

24

contemporaneous corroboration," and that Agent Friedman's "training and experience" which informed him that kidnappers generally use phones to communicate with one another and store evidence of the crime, was not enough to establish the requisite probable cause to seize Chowdhury's phones. Chowdhury Auto Ltr. at 5–6. Chowdhury, however, points to no caselaw which holds that probable cause cannot be based on a complaining witness's statements to police, even if they are hearsay when relayed by the agent. The Court credits Agent Friedman's testimony that John Doe-2 reported to him that the kidnappers filmed the kidnapping and assault, *see* Sept. 10 Hr'g Tr. at 334–35, even if he did not identify Chowdhury specifically as the person who held the phone(s) while filming, and considers that fact as part of its probable cause analysis with respect to Chowdhury's cell phones.

A recent decision from the Second Circuit, *United States v. Silva*, is particularly instructive on this point. In *Silva*, the Circuit found that probable cause to search a cell phone was established by (1) the defendant's gang activity and participation in alleged racketeering activities and (2) the law enforcement officer's "familiarity with the manner in which gang members and individuals engaged in violent crime use cell phones in connection with such activity." 146 F.4th at 192 (internal quotation marks omitted and alterations adopted). The Circuit found that it was likely those engaged in racketeering would communicate with others about that criminal activity, and that evidence on record "[t]hat [the defendant] communicated with multiple other members of [the gang] in the course of [the] alleged conspiratorial conduct tends to support the inference that his cell phone

contained evidence of that conduct." *Id.* Thus, the Circuit concluded, "common sense and [the law enforcement agent's] experience combine . . . to support a reasonable inference" that evidence of criminal conduct would be found on the defendant's cell phone. *Id.* at 193 (internal quotation marks omitted).

Here, the information Agent Friedman obtained from his interview with the complainant, viewed through the lens of common sense and combined with Agent Friedman's training and experience, provide a reasonable inference that evidence connected to the kidnapping would be found on Chowdhury's phone(s). Agent Friedman had reason to believe there may be actual video of the kidnapping on one or more of the kidnappers' phones based on John Doe-2's statements. Additionally, he was investigating a multi-day, multi-perpetrator kidnapping, in which the complainant reported that he been lured to a specific location by a female acquaintance (Lubna) who was allegedly a member of the conspiracy; it was reasonable to infer that in 2023, at least some of the assailants' communication in planning and executing this crime was done via cell phone. Even if John Doe-2 could not identify the properties of the exact phone his assailant was holding, the Second Circuit in *Silva* affirmed that probable cause does not require "probable cause of the *use* of the property in furtherance of criminal conduct, so long as there is probable cause that the location to be searched contains relevant evidence of the criminal conduct." *Silva*, 146 F.4th at 190 (emphasis in original). And the Court finds that there was, as of May 31, 2023, a fair probability that the assailant identified by John Doe-2 as Chowdhury was either the man recording the assault on his own phone, or

26

that the video had been shared with him by a co-perpetrator and saved on his phone. Thus, this Court agrees with the government that, as of May 31, 2023, there was a "fair probability that contraband evidence of a crime [would] be found" on Chowdhury's phone(s). *Lauria*, 70 F.4th at 128.

 b. <u>Warrantless Seizure of the Phones</u>

While the Court does conclude that, at the time of the traffic stop, probable cause existed to search Abu Chowdhury's cell phone(s) on May 31, 2023, law enforcement did not seek or obtain a warrant to seize and search his phone(s) on that day. To use any of the evidence recovered from Chowdhury's phones at trial, then, the government must prove that their seizure was "subject only to [one of] a few specifically established and well-delineated exceptions" to the Fourth Amendment's warrant requirement. *Katz*, 389 U.S. at 357.

 i. *Seizure and Retention of the Blue Phone*

The government first argues that the initial seizure of the Blue Phone was proper pursuant to a search incident to arrest. The Court agrees. "[I]nterests in officer safety and evidence preservation that are typically implicated in arrest situations" allow an officer to properly search an individual's person upon arrest. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). The seizure of evidence from a search incident to arrest "requires no additional justification; rather, it is the fact that the lawful arrest which establishes the authority to search a person, and to seize evidence from that search." *United States v. Handler*, No. 23-cr-4 (JHR), 2023 WL 2584217,

at *3 (S.D.N.Y. Mar. 21, 2023) (seizure of cell phones that were on the defendants' persons at the time of the arrest fell within the search incident to arrest exception).[8]

Even items that are not related to the initial arrest can be seized in a search incident to arrest if they are evidence of criminal conduct. *See United States v. Robinson*, 414 U.S. 218, 223 (1973). Additionally, items that are not necessarily seized as evidence of a crime, but rather are seized as personal property, can still be held by law enforcement — at least while the defendant remains in custody. *See United States v. Edwards*, 415 U.S. 800, 807 (1974) ("[O]nce the accused is lawfully arrested and is in custody, the effects in his possession . . . that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant . . . ."); *see also United States v. Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974) (upholding a search of a defendant's wallet that was kept for safekeeping while the defendant was in custody).

Detective Schiavone, who was involved in the May 31, 2023 traffic stop, testified that upon Chowdhury's search incident to arrest for operating a motor vehicle with a suspended license, "[a] wallet and a cell phone" were found on his person. Aug. 26 Hr'g Tr. at 210. This was the "[B]lue [P]hone." *Id.* at 211. Specifically, he testified that the Blue Phone was found in Chowdhury's pocket. *Id.* at 236. Thus, the *initial* seizure and inventory of the Blue Phone was clearly proper, at least during the hours while Chowdhury was detained on May 31, 2023.

---

[8] Importantly, an officer's authority to seize a cell phone during a search incident to arrest is not the same as their authority to *search* that cell phone — for which they would need a warrant. *See Riley v. California*, 573 U.S. 373, 386 (2014).

Chowdhury next argues that the *continued* retention of the Blue Phone, after Chowdhury was released from NYPD custody that same day, was unconstitutional. Chowdhury Reply at 10–13. This is because, he argues, "there was no probable cause to believe the phone constituted evidence of a crime." *Id.* at 11. Chowdhury principally relies on an Eastern District of New York case, *United States v. Herron*, to support his position. 18 F. Supp. 3d 214 (E.D.N.Y. 2014) (NGG). In *Herron*, police officers arrested the defendant for littering, and lawfully seized "body armor along with [the d]efendant's other personal effects, at least for the duration of the custodial arrest." *Id.* at 224. However, the court in *Herron* found that law enforcement's *continued* retention of the body armor *after* the defendant was released from custody was unlawful. *Id.* At the time of his release, "the legal authority to search incident to arrest expired" because "the temporal scope of legal authority incident to arrest is not limitless." *Id.* Relying on *United States v. Place*, 462 U.S. 696, 701 (1983), which held that the retention of a suitcase for over ninety minutes required probable cause, the court in *Herron* found that a "permanent seizure is justified only upon a showing of probable cause." *Herron*, 18 F. Supp. 3d at 224. It then outlined how, at the time of Herron's release from custody, police lacked probable cause to believe that the body armor (which was seized as a personal effect) was evidence of a crime — making its continued seizure after the defendant was released from custody unlawful. *Id.* at 225–29.

Chowdhury's case is different. Unlike in *Herron*, when the Blue Phone was inventoried as personal property of Chowdhury after a search incident to arrest, there

*was* probable cause to believe it contained evidence of a crime: namely, evidence related to the alleged kidnapping of John Doe-2. *See supra*. Thus, even under *Herron*'s holding that law enforcement's continued retention of personal property after an arrestee's release from custody must be supported by independent probable cause as to that item, the government has met that bar. For this reason, it was lawful for the investigating agents to continue to hold the Blue Phone after Chowdhury's release from custody in order to give themselves a reasonable opportunity to seek a warrant to search its contents. *See Place*, 462 U.S. at 701 ("Where law enforcement authorities have probable cause to believe that a container holds contraband . . . , the [Fourth] Amendment . . . permit[s] seizure of the property, pending issuance of a warrant to examine its contents, if . . . [a] recognized exception to the warrant requirement is present.").

ii. *Seizure of the Red Phone*

The government claims that three separate exceptions to the warrant requirement justified the seizure of the Red Phone. First, it argues that the Red Phone was validly seized in the course of an inventory search of Chowdhury's vehicle, or that it *would* have been seized in the course of an inventory search, and is thus covered by the doctrine of inevitable discovery. Gov't Opp. at 57–69**.** Next, the government argues that the Red Phone was properly seized pursuant to the automobile exception. Gov't Auto. Ltr. at 3–5. Finally, the government contends that the Red Phone was seized pursuant to the "plain view" exception. *Id*. at 5. For the following reasons, this Court finds that none of the foregoing exceptions apply to the

30

seizure of the Red Phone, and its contents must be suppressed as fruits of the unlawful seizure.

As discussed *supra*, there was conflicting testimony between law enforcement officers as to the exact sequence of events that led to the seizure of the Red Phone. As relevant here, the Court discusses and resolves those conflicts with the following findings of fact.

Agent Friedman testified that as he approached the vehicle after the traffic stop, he saw a woman in the front passenger seat (later identified as Lubna), and a phone in the center console between the driver's seat and front passenger seat. *See* Aug. 26 Hr'g Tr. at 89. He further testified that the woman exited the vehicle, and she took the phone from the center console (later identified as the Red Phone) with her as she got out. *Id.* at 91–92. He said that she was at that point holding two phones, and Lt. Provencher asked, "whose phone is that," referring to the Red Phone, and she said it was Abu Chowdhury's. *Id.* at 154. Lt. Provencher then explained that the phone had to go to the precinct with the rest of Chowdhury's property, and she handed him the phone. *Id.* at 155. After handing Lt. Provencher the Red Phone, Chowdhury and Lubna had some "communication," after which Lubna sought to get Chowdhury's phone back. *Id.* at 156–57. This sequence of events is consistent with what Agent Friedman provided in his June 9 Warrant Affidavit. *See* June 9 Warrant Aff. ¶ 22 (adding that after handing the phone to police "Lubna . . . began to demand that the police return" the phone to her). It is also the narrative that was presented to the Court in the government's initial opposition to Chowdhury's motion. *See* Gov't

31

Opp. at 17 ("Lubna exited from the front passenger seat holding two cell phones, one that she identified as her cell phone, and the other, a red Apple iPhone . . . , which had been on the top of the center console.").

But at the August 26 hearing, the government presented a different account. It elicited testimony from Lt. Provencher that when he looked in the vehicle, he saw the Red Phone on the center console. Aug. 26 Hr'g Tr. at 276. He then said that when Lubna handed him the phone, she was "seated in the passenger seat." *Id.* at 277. Thus, according to Lt. Provencher, the phone was *inside* the vehicle at the time he asked her to hand it to him. *Id.* ("Q: [S]he handed you the phone voluntarily? A: Yes. At my request.  Q: And where was she at the time she handed the phone to you?  A: She was seated in the passenger seat.").

Ultimately, the Court must decide whether to credit Agent Friedman's testimony that Lubna was *out* of the vehicle when she handed the phone to Lt. Provencher or Lt. Provencher's testimony that she was still seated in the passenger seat when she did so.  After hearing their testimony and reviewing the supporting documentation, the Court credits Agent Friedman's account.  This is due not only to their respective demeanors on the witness stand, but also because Agent Friedman had semi-contemporaneously memorialized the incident in his June 9 Warrant Affidavit, whereas Lt. Provencher did not have a memo book entry from the incident. Aug. 26 Hr'g at 288.  As far as the Court is aware, the first time Lt. Provencher was asked to testify to the details of this more than two-year-old car stop was at the hearing itself, after the government had already posited that certain exceptions to

32

the warrant requirement covered the seizure of the Red Phone. Thus, crediting Agent Friedman's testimony, the Court finds that at the time Lt. Provencher ordered Lubna to hand him the Red Phone, she was already outside of the vehicle.

### 1. Inventory Search

The government first argues that the Red Phone was properly seized without a warrant pursuant to a valid inventory search, or, in the alternative, is subject to inevitable discovery because it *would* have been found pursuant to a valid inventory search after Chowdhury was arrested. *See* Gov't Opp. at 60–69. The Court disagrees.

An inventory search permits law enforcement to search and inventory impounded property to (1) ensure that it poses no danger to others, (2) secure any valuables for safekeeping, and (3) protect the department against claims of stolen property or damage. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987). The legality of an inventory search depends on whether it was conducted pursuant to "established inventory procedures." *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983). This is important so that the search itself does not become "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

The inventory search doctrine is often analyzed in tandem with the doctrine of inevitable discovery. This is because, even if evidence was improperly seized, if the government can show that it *would* have inevitably been discovered through legal means, the seizure does not violate the Fourth Amendment. *See Nix v. Williams*, 467 U.S. 431, 444 (1984). But the government may not simply claim that discovery was inevitable: it must show that there was a "standardized procedure" providing for an

33

inventory in these circumstances, which would have invariably led to the discovery of this evidence. *See United States v. Griffiths*, 47 F.3d 74, 78 (2d Cir. 1995). Thus, to justify a warrantless seizure on these grounds, the government must show "(1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified, (2) that when the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures, and (3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence." *United States v. Antonio Fabian*, No. 16-cr-131 (DLI), 2019 WL 3578226, at *6 (E.D.N.Y. Aug. 6, 2019) (internal quotation marks omitted).

The government's argument here fails for a simple reason: the Red Phone was not actually in Chowdhury's vehicle when it was seized. It was in the hands of a third party — his fiancée, Lubna — who was not under arrest but was nevertheless ordered to hand the phone over to police. Thus, the Red Phone could not have been subject to an inventory search of Chowdhury's vehicle under standard NYPD procedures.

That relatively simple conclusion, however, requires some discussion of the government's take on the facts and their corresponding legal application. As a threshold matter, the Court has no quarrel with the government's claim that Chowdhury's vehicle was properly impounded because the car was "unregistered with a non-matching license plate," and driving it would be illegal. *See* Gov't Opp. at 59. The government then asserts that (1) the Red Phone was in the car at the time of Chowdhury's arrest, (2) his arrest marked the moment that the vehicle was in NYPD

34

"custody," and (3) the Red Phone was thus subject to an inventory search.  *Id.* at 60 (citing *United States v. Rivera*, 2019 WL 3578226, 73 (S.D.N.Y. 2023) ("Once police take custody of a vehicle, they may search the vehicle and make an inventory of its contents . . . .") (internal quotation marks omitted)).

There are two problems with the government's argument.  First, the government has not proven that the Red Phone was in the vehicle at the moment Chowdhury was arrested (and the record is, at best, unclear on this point).  Second, even assuming the Red Phone was still in the vehicle when Chowdhury was placed under arrest, it was taken *out* of the vehicle by Lubna before Lt. Provencher seized it, and thus it was not subject to an inventory search.[9]

The government asserts that "the Red Phone was in the vehicle when law enforcement took custody of the vehicle."  Gov't Opp. at 62.  But this is far from clear. As noted *supra*, the Court has already found that Lubna was outside of the vehicle at the time she handed Lt. Provencher the Red Phone.  And in the June 9, 2023 Warrant Affidavit — which is the most contemporaneous account of the vehicle stop available to the Court — Agent Friedman wrote that "[w]hile Detective Schiavone informed

---

[9] Chowdhury and the government also dispute whether the actual inventory search of the vehicle was conducted pursuant to valid criteria, and evidence at the hearing was offered to show that when the officers inventoried the vehicle, they provided handwritten, instead of the required printed, receipts.  *See* Aug. 26 Hr'g Tr. at 223–24.  Chowdhury also points to the fact that the phones, when invoiced, were not marked for "safekeeping," but rather as "investigatory evidence," showing that the search was in bad faith as it was "*solely* for the purpose of investigation." Chowdhury Reply at 22–23 (quoting *United States v. Rivera*, 700 F. Supp. 3d 60, 75 (S.D.N.Y. 2023) (emphasis in original)).  Because the Court finds that neither the inventory search nor the inevitable discovery exceptions to the warrant requirement apply to the Red Phone, resolving these disagreements is not necessary.

Chowdhury that he was under arrest, Lubna exited from the front passenger seat holding two cellular telephones." June 9 Aff. ¶ 22.  However, neither Agent Friedman nor Detective Schiavone testified as to exactly where Lubna was when Chowdhury was placed under arrest.  Lt. Provencher did testify (two years after the fact) that she was in the vehicle when she handed him the Red Phone, Aug. 26 Hr'g Tr. at 276–77, but for the reasons discussed *supra*, the Court does not credit that testimony.  Thus, the Court does not find that the government has established, by a preponderance of the evidence, that the Red Phone was in the vehicle when Chowdhury was placed under arrest.

More fundamentally, regardless of whether the Red Phone was in the vehicle when Chowdhury was arrested, to avail itself of the inventory search exception, the government must show that the Red Phone was in the vehicle when the vehicle was taken into custody.  *See Bertine*, 479 U.S. at 372 (stating that inventory searches "serve to protect an owner's property while it is in the *custody* of the police" (emphasis supplied)).  And it has not done so here.  It is true, as the government points out, that an inventory search need not take place at the police station after a vehicle is impounded; police may, for example, inventory a vehicle's contents at the scene when making a roadside arrest.  *United States v. Henderson*, 439 F. App'x 56, 58 (2d Cir. 2011) (summary order).  The government, however, equates Chowdhury's arrest and the "custody" of the vehicle in a manner that is not supported by any caselaw — *i.e.,* that "[w]ith the vehicle *subject to impoundment* and *Chowdhury arrested*, the vehicle was in NYPD custody."  Gov't Opp. at 60 (emphasis supplied).  The government cites

36

to no caselaw, nor to any NYPD procedure, that pins the moment of arrest as the moment that police have "custody" of the vehicle for purposes of an inventory search, and this Court is aware of none.  *See* NYPD Patrol Guide, Inventory Searches of Automobiles and Other Property, Gov't Opp. Ex. 8, ECF No. 303-8 (explaining only that an inventory search may be conducted "[w]henever any property comes into the custody of this Department," but not defining "custody").  Thus, the government has not met its burden of showing, by a preponderance of the evidence, that the Red Phone was inside the vehicle at the time the NYPD took the vehicle into custody — and thus, the warrantless seizure of the Red Phone cannot be considered part of an inventory search of the vehicle's contents.

The government relies heavily on *United States v. Cancel*, in which the court found that the NYPD had properly seized a gun recovered from an inventory search of the defendant's belongings during an inventory of his property upon his arrest, and held that the NYPD was not required to have "permitted a family member or friend to retrieve [the defendant's] belongings."  167 F. Supp. 3d 584, 596 (S.D.N.Y. 2016) (internal quotation marks omitted).  This Court has no quarrel with *Cancel*'s reasoning; certainly, there is no legal requirement that police refrain from conducting an otherwise-standard inventory of an arrestee's property while awaiting the hypothetical possibility that a third party might come and collect the arrestee's property.  But in *Cancel*, the defendant was arrested in a subway station while traveling alone, and for various reasons (including concerns about the officers' safety), the arresting officers inventoried his backpack, pursuant to standard NYPD

procedures, before transporting him to the precinct. *Id.* at 595–96. And the *Cancel* court rejected the argument that simply because the NYPD "*could have* permitted a family member or friend to retrieve [the defendant's] belongings at the precinct" before conducting that inventory, the search was invalid. *Id.* at 596 (emphasis supplied). Yet that is a very different scenario than the one presented here, in which Lubna exited the car with Chowdhury's phone in hand, and the defense is not merely hypothesizing that she (or someone else authorized by Chowdhury) was present at the scene or could have come to the station to retrieve it before an inventory search was conducted.

The government also argues that, like in *Cancel*, "the police had no obligation . . . to follow the defendant's purported direction and to give Chowdhury's Phones to Lubna rather than to invoice them." Gov't Opp. at 65; *see also* June 9 Warrant Aff. ¶ 22 (noting that, after giving the Red Phone to the police, "Lubna then began to demand the police return [the Red Phone] to her"). It is true that, had officers validly seized the Red Phone before Lubna requested that it be given to her (for example, had they recovered it from Chowdhury's pocket when they arrested him, or had it been sitting in the glove compartment when they took the vehicle into custody), the officers would not have been under any obligation to comply with that request. But that is not what happened here. When the officers seized the phone from Lubna, she (1) was outside of the vehicle, (2) was not herself under arrest, and (3) had the phone in her possession. The Court's task is to determine whether that original seizure, not law enforcement's subsequent refusal to return the phone, is

38

covered under the inventory search exception.  Because the Red Phone was not in the vehicle at the time it was seized, its seizure cannot be justified as part of an inventory search of the vehicle.

Nor has the government established that the Red Phone was subject to inevitable discovery.  "The [inevitable discovery] doctrine requires the district court to determine, viewing affairs as they existed at the instant before the unlawful [seizure], what *would have happened* had the unlawful [seizure] never occurred." *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992).  At the moment before the unlawful seizure — *i.e.,* when Lubna was directed to hand over the Red Phone — Lubna was standing outside of the vehicle holding both the Red Phone and her own phone.  The government makes no argument (and there is no evidence from which such an inference can be drawn) that had Lt. Provencher not ordered Lubna to give him the Red Phone, she would have put it back in the car of her own accord, making it subject to an inventory search.  Rather, the Court concludes that the far more likely alternate scenario (*i.e.,* "what would have happened" absent a directive to hand over the Red Phone, *see id.*) is that Lubna would have walked away from the traffic stop with the Red Phone still in hand.  That would have given law enforcement no opportunity to seize it in a subsequent NYPD inventory search.  Thus, the government has not met its burden of proving that the inevitable discovery doctrine applies here.

### 2. Automobile Exception

Next, the government argues that the Red Phone was properly seized as a valid search pursuant to the so-called automobile exception. *See generally* Gov't Auto. Ltr. This argument fails for largely the same reason the inventory search argument fails — the Red Phone was not inside the car when it was seized.

The automobile exception to the warrant requirement allows a law enforcement officer to search a vehicle without a warrant when that officer has probable cause to believe that a vehicle contains evidence of a crime. *See generally Carroll v. United States*, 267 U.S. 132, 149 (1925); *see also United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) ("[P]olice may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe *the vehicle contains* contraband or other evidence of a crime.") (emphasis supplied). At the time of the May 31, 2023 traffic stop, there was probable cause to believe that Abu Chowdhury's phones contained evidence of criminal activity, specifically the kidnapping of John Doe-2. However, given the Court's factual findings *supra*, the Red Phone was not seized pursuant to a search of Chowdhury's vehicle, but rather from Lubna *outside* of the vehicle. Not only that, but both the Warrant Affidavit written by Agent Friedman and his testimony at the hearing indicated that law enforcement did not know the Red Phone was Abu Chowdhury's until the phone itself was outside of the vehicle. *See* Aug. 26 Hr'g Tr. at 154 (testifying that when Lubna was outside of the vehicle, "the question [she was asked by police] was whose phone is that? The one that she took from the center console. And she said it was Abu Chowdhury's"); June 9 Warrant

40

Aff. ¶ 22 ("Lubna exited from the front passenger seat holding two cellular telephones . . . . Lubna indicated that [the Red Phone] belonged to Chowdhury.").[10]  Thus, because law enforcement only knew that the Red Phone belonged to Abu Chowdhury after Lubna exited the vehicle, probable cause that the Red Phone contained evidence of criminal activity only developed *after* it was outside of the car.

The government points this Court to no authority that allows it to invoke the automobile exception in circumstances like these — that is, to allow for the warrantless seizure of an item of property that is not actually in an arrestee's vehicle, simply because it was previously in that vehicle.  Indeed, the Supreme Court has made clear (albeit in different circumstances), that "the automobile exception extends no further than the automobile itself."  *Collins v. Virginia*, 584 U.S. 586, 594 (2018). And other courts have applied this rule to find that searches of containers *outside* a vehicle are not subject to the automobile exception where (as here) probable cause only developed after they were removed from the vehicle.  *See, e.g.*, *People v. Boler*, 964 N.Y.S.2d 688, 692 (N.Y. App. Div. 2013) (holding that the search of a purse on the hood of a car "[was] not authorized by the automobile exception because it was not found inside the vehicle"); *State v. Maloney*, 489 P.3d 847, 854 (Idaho 2020) ("The automobile exception does not apply to allow the search of [the defendant's] purse because it was not in the vehicle when probable cause arose.").  This Court concurs. Thus, because the Red Phone was outside of the vehicle at the time law enforcement

---

[10] As explained *supra*, the Court does not credit Lt. Provencher's conflicting testimony that the phone was handed to him while Lubna was still sitting inside the vehicle.

learned that it was Chowdhury's phone, the automobile exception does not apply to its warrantless seizure.

### 3. *Plain View*

Finally, the government argues that the warrantless seizure of the phone falls under the "plain view" exception to the warrant requirement. *See* Gov't Auto. Ltr. at 5 n.5 ("Even if Lubna was outside the vehicle when law enforcement seized [the Red Phone], the phone would still be properly seized pursuant to the plain view doctrine."). The Court disagrees.[11]

---

[11] Chowdhury argues that the government forfeited the plain view argument. *See* Chowdhury Auto. Ltr. at 4. This argument, like the automobile exception argument, was not in its initial opposition. At the August 26 hearing, the government brought up the automobile exception for the first time. *See* Aug. 26 Tr. at 29–30. The Court did not deem it waived at that point, but did express its "sincere displeasure" that the argument came up so late, even after the Court had already granted the government leave to submit a sur-reply prior to the hearing on a different issue. *Id.* at 290. The Court nevertheless granted the government leave to submit a letter brief on the automobile exception, and the government assured the Court that it would be "very small and narrow." *Id.* at 263. Then, in that supplemental briefing, the government newly contended that the plain view doctrine was yet another independent exception to the warrant requirement which allowed law enforcement to seize the Red Phone. *See* Gov't Auto. Ltr. at 5 n.5.

"[S]earches and seizures conducted without a warrant are presumptively unreasonable." *United States v. McCargo*, 464 F.3d 192, 196 (2d Cir. 2006). Thus, when presented with motion to suppress, it is incumbent upon the government, in its initial opposition, to provide the Court with every exception to the warrant requirement known to the government that would establish that the warrantless search under challenge was reasonable. That requirement permits the Court to assess, for example, whether to order an evidentiary hearing, and how much time to allot for the hearing if so; it also informs both the defense's and the Court's preparation for the hearing. For the government to raise new multiple new arguments after the initial hearing can severely prejudice the defense in its ability to respond, forcing them to play a game of "exception whack-a-mole." However, because the Court does not find that the plain view exception applies on the present record in any event, it will refrain from passing on whether the argument was forfeited.

The plain view doctrine provides that "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). "The doctrine serves to supplement the prior justification — whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accuses — and permits the warrantless seizure." *Horton v. California*, 496 U.S. 128, 135–36 (1990).

The government cites to *United States v. Babilonia*, 854 F.3d 163 (2d Cir. 2017), for the proposition that cell phones can be validly seized under the plain view doctrine. Gov't Auto. Ltr. at 2–3. *Babilonia* concerned the seizure of electronic devices that officers saw when they were lawfully inside the defendant's apartment while executing an arrest warrant. 854 F.3d at 172. Because the officers had probable cause to believe that evidence of criminal activity would be found on his electronic devices, the Court found that upon seeing these devices, officers were entitled to seize them (though not search them) under the plain view doctrine. *Id.* at 180; *see also United States v. Chierchio*, No. 20-cr-306 (NGG), 2022 WL 523603, at *10–11 (E.D.N.Y. Feb. 22, 2022) (citing to *Babilonia* in upholding a seizure of electronic devices under similar circumstances). The Court agrees with the government that if the Red Phone had been in plain view during a search of Chowdhury's home or vehicle while executing a warrant authorizing the seizure of other items, the plain view exception would permit the seizure of the phone.

43

However, the government has pointed this Court to no caselaw, nor is this Court aware of any, in which the plain view doctrine permitted the warrantless seizure of a cell phone where it was merely visible to the officers in a public place. In both *Babilonia* and *Chierchio*, the officers had judicial authorization to search the suspect's home pursuant to a warrant. Obviously, the officers in Chowdhury's case had the right to be standing in the street next to Lubna while she was holding the Red Phone after a lawful traffic stop. But holding that these common circumstances allow officers to invoke the plain view doctrine even where no other exception to the warrant requirement applies is not only unsupported by precedent; it would risk creating an exception for the warrantless seizure of cell phones so broad that, as a practical matter, it might entirely swallow the rule.

A hypothetical underscores why the plain view exception cannot sweep so broadly. Take a case in which law enforcement, after months of investigation, developed probable cause to believe that the manager of a bodega was implicated in a criminal conspiracy to commit wire fraud. Drawing on their training, experience, and the investigation thus far, suppose that the agents also had probable cause to believe that the suspect's cell phone contained evidence of this conspiracy. If the agents were to walk into that individual's bodega — a place they have a lawful right to be — and saw him speaking on his cell phone behind the counter, would they have authority to simply demand he give them his cell phone without first obtaining a warrant? This Court cannot conceive that the Second Circuit in *Babilonia* intended for the plain view doctrine to eclipse the warrant requirement in these circumstances,

particularly since the ordinary course of action (applying for a warrant to seize a suspect's phones once investigators develop probable cause) is readily available. This also accords with the purpose behind the plain view doctrine, as it "serves to supplement the prior justification" for an officer's presence, *Horton*, 496 U.S. at 135, not to permit the police to make warrantless seizures of electronic devices from suspects in public spaces.

Thus, because the Red Phone was seized without a warrant, and its seizure is not subject to any exception to the warrant requirement, any evidence obtained from the resulting search must be suppressed. *See Wong Sun v. United States*, 71 U.S. 471, 484–85 (1963).[12]

## III.    Search of Chowdhury's Phones Pursuant to the June 9 Warrant

Chowdhury argues that, independent of the seizure of the phones, the searches of the phones' data pursuant to the June 9 Warrant were in violation of his rights for

---

[12] The government argues that the evidence from the Red Phone is subject to "inevitable discovery" because the June 9 Warrant affidavit did not rely on any evidence learned in the seizure, and thus the Red Phone would have been seized and searched pursuant to the warrant even if it was not improperly seized on May 31, 2023. Gov't Opp. at 78–79. However, that warrant was obtained nine days after the Red Phone was identified as Chowdhury's (and unlawfully seized), and by that time, "it is far from clear that the officers could have located the [Red Phone] if they had waited to obtain a warrant to seize it, or that any such warrant could have described [the Red Phone] with sufficient particularity." *United States v. Crutchfield*, No. 22-cr-269 (PJS) (DJF), 2023 WL 3868710, at *6 (D. Minn. Mar. 21, 2023) *report and recommendation adopted*, 2023 WL 3317992 (May 9, 2023). Thus, the government's contention that, even without the improper seizure, it "would have seized Chowdhury's [Red Phone] pursuant to" the June 9 Warrant, Gov't Opp at 79, is unsupported by any evidence, and the Red Phone is not subject to inevitable discovery.

three separate reasons: (1) there was an unreasonable delay between the seizure of the phones and the application for the June 9 Warrant; (2) the June 9 Warrant Affidavit lacked probable cause and contained a materially misleading omission; and (3) Agent Friedman's initial search of the Blue Phone pursuant to June 9 Warrant exceeded the scope of the warrant.[13]  Chowdhury makes particularly compelling arguments on the merits of two of these claims — the government's nine-day delay in seeking the warrant, and the dearth of probable cause in the four corners of the June 9 warrant affidavit.  But ultimately, his motion to suppress fails as to each of these claims because on this record, the good faith exception to the exclusionary rule applies.

     a. <u>Unreasonable Delay</u>

It is undisputed that the Blue Phone was seized from Chowdhury on May 31, 2023.  *See* June 9 Warrant Aff. ¶ 22.  It is also undisputed that Agent Friedman did not apply for a warrant to search the Blue Phone until June 9, 2023.  *See* Aug. 26 Hr'g Tr. at 97.  In the intervening nine days, the Blue Phone was kept at the FBI office, even though Chowdhury requested it be returned to him beginning on May 31.  *Id.* at 93.  Chowdhury argues that the nine days that elapsed between the phone's seizure and the warrant application constituted an "unreasonable delay" in violation

---

[13] Chowdhury's first and second arguments apply to both the Blue Phone and the Red Phone.  As the Court is suppressing evidence recovered from the Red Phone because the seizure itself was unconstitutional, as a practical matter, the Court's conclusions here are only relevant to whether the government may use the data recovered from the Blue Phone.  However, because the June 9 Warrant concerned both phones, and the parties' arguments concerned both phones, the Court will analyze the issues related to the June 9 warrant as they pertain to both phones.

of his Fourth Amendment rights, and that the fruits of the search pursuant to that warrant must therefore be suppressed.  *See* Chowdhury Mot. at 27–30.

The Court agrees that, under Second Circuit precedent, the time between the seizure of Chowdhury's phones and filing of the June 9 warrant application did constitute an unreasonable delay.  This is in large part because the government has offered *no* justification for that delay (much less a compelling one), even in a case where the government admits that it had probable cause to seek the warrant on day one (*i.e.,* the day the phones were seized at the traffic stop).  However, because the Court ultimately does not find that this delay was due to either gross negligence or intentional misconduct on the part of Agent Friedman, the exclusionary rule does not apply. *See United States v. Smith*, 967 F.3d 198, 211–12 (2d Cir. 2020) (finding unreasonable delay in seeking warrant one month after seizure of electronic tablet, but declining to suppress evidence because officer did not "act[] with a deliberate intent to violate Smith's rights," and the officer's failure to seek an earlier warrant was not "reckless or grossly negligent").

When law enforcement seizes property pursuant to a valid exception to the warrant requirement, "the Fourth Amendment allows the police to seize or secure . . . property without a warrant provided that they follow up by applying to a judge for a warrant to search the property's contents."  *Smith*, 967 F.3d at 205. However, "even a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant." *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998).

The Second Circuit has directed district courts to analyze four factors in determining whether an officer has violated the prohibition against unreasonable delay in seeking a warrant after a seizure of property. They are: "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay." *Smith*, 967 F.3d at 203.

i. *The Length of the Delay*

The nine-day delay weighs in favor of Chowdhury. First, the Second Circuit has clearly stated that it would "normally expect police officers to secure a search warrant in *considerably less time*" than eleven days. *Martin*, 157 F.3d at 54 (emphasis supplied); *see also Smith*, 967 F. 3d at 206 (quoting and reaffirming this aspect of *Martin*'s holding). And while nine days is fewer days than eleven days, this Court does not interpret it as "considerably" fewer days. *See Considerable*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/considerable (defining considerable as "large in extent or degree") (last visited Oct. 21, 2025). Thus, the government and its agents were on notice since *Martin* was decided in 1998 — twenty-five years before the warrantless seizure of Chowdhury's phone — that they generally needed to seek a warrant far more quickly than they did here.

Indeed, while the Second Circuit did not find that the eleven-day delay was unreasonable in *Martin*, it did so *despite* the fact that eleven days had elapsed between the seizure and the warrant application, not because of it. *See Martin*, 157 F.3d at 54 ("In some circumstances eleven days might well constitute an

48

unreasonable delay. However, several factors lead us to conclude that, under the particular circumstances present here, the delay was not constitutionally infirm."). The Court relied on the fact that the eleven days spanned two weekends and the Christmas holiday, that the seized package was sent by the defendant in the mail, "thus weakening his claim to Fourth Amendment privacy," that it was less intrusive because he relinquished the package to a third party, and that the seizure did not restrict his liberty interests, *i.e.*, it was not like the seizure of luggage which disrupts a traveler's plans. *Id.* Thus, the *Martin* Court considered *other* factors beyond the length of the delay itself and found that they outweighed the eleven-day delay, making it reasonable.

The Second Circuit in *Smith* also provided important context for evaluating the length of the delay itself: when in the timeline of events did the government develop probable cause to believe that evidence of a crime would be found on the seized item? *See Smith,* 967 F.3d at 206–07. As the *Smith* Court explained, before finding the delay in that case was unconstitutional:

> [I]f the police have probable cause to seize an item in the first place, there is little reason to suppose that they cannot promptly articulate that probable cause in the form of an application to a judge for a search warrant. . . . Every fact that was material to probable cause was set forth in a single paragraph in the search warrant application. Every one of these facts was known to the police on the same day that the tablet was seized from [the defendant].

*Id.* at 207.

The above could almost be written word for word to describe the instant case. As discussed *supra*, the government has strenuously argued, and this Court agrees,

that as of May 31, 2023 Agent Friedman had probable cause to believe that Chowdhury participated in the kidnapping of John Doe-2, *and* that the Blue Phone contained evidence of that criminal activity.  Agent Friedman testified at the hearing that this was, in fact, his assessment *prior* to the carefully orchestrated May 31 traffic stop, a joint FBI-NYPD operation conducted solely for the purpose of seizing Chowdhury's phone(s).  Additionally, in outlining probable cause in the June 9 Warrant Affidavit, Agent Friedman does not rely on any information gathered after May 31, 2023.  *See* June 9 Warrant Aff. ¶¶ 6–28.  While Agent Friedman does recite certain events that occurred after the seizure in his affidavit, such as Chowdhury asking for the phones back upon his release from NYPD custody, *see id.* ¶ 25, and the phones themselves showing signs of regular usage, *see id.* ¶ 26, that is still information that Agent Friedman learned on May 31, 2023.  *See id.* (showing pictures of the seized cell phones' home screens to show regular usage with the date clearly displaying "Wednesday, May 31").  Because probable cause existed to seize the Blue Phone prior to the actual seizure of the phone, "there is little reason to suppose why [Agent Friedman could not] promptly articulate that probable cause in the form of an application to a judge for a search warrant" one or two days after the seizure, if not on the day of the seizure itself.  *Smith*, 967 F.3d at 207.

The government cites to a string of district court cases in this Circuit which have found that delays greater than one week but less than one month were not unreasonable, and they were considered, at worst, "neutral factors."  *See* Gov't Opp. at 71.  Many of these cases discounted weekends or declined to consider days that a

law enforcement officer was not assigned to work.  *See, e.g.*, *United States v. Watson*, 23-cr-82 (EK), 2023 WL 7300618, at *9 (E.D.N.Y. Nov. 6, 2023) (holding that six days of a 19 day delay were weekend days and they "therefore may be discounted"); *United States v. Hiya*, No. 24-cr-282 (VM), 2024 WL 5004586, at *4 (S.D.N.Y. Dec. 6, 2024) (finding that a delay of nine business days did "not favor either party"); *United States v. Kamaldoss*, No. 19-cr-543 (ARR), 2022 WL 1200776, at *16 (E.D.N.Y. Apr. 22, 2022) (holding that, "where the fifteen-day delay included two weekends and involved packages of contraband that were put into the stream of mail, this period of delay should not weigh against the government").  Here, there was one weekend between May 31, 2023, and June 9, 2023, and the government offered no evidence as to Agent Friedman's work schedule.  Thus, for this Court to discount days based on when Agent Friedman might or might not have been working would be pure speculation.[14]

It is true there appear to be no published decisions in this Circuit in which a court has held that a delay of nine days or fewer between the seizure of property and the procurement of a warrant was unreasonable.  This does not mean, however, that nine days is *per se* reasonable.  Indeed, in all the cases on which the government relies where a court has found similar delays to be reasonable, these courts found that *other* factors in the *Smith* test weighed in favor of the government.  For example, in *Watson*,

---

[14] In addition, the Court notes that a seven- (or nine-, or eleven-) day delay would, by definition, always include at least two "weekend" days.  And given the *Martin* and *Smith* Courts' directives that the Fourth Amendment ordinarily requires agents to seek a warrant in considerably fewer than eleven calendar days, it is hard to see why weekend days should be considered any less relevant to that analysis than weekdays, since the Second Circuit seems to have already accounted for them.

the defendant ran a media company, and the agents needed approval from both the United States Attorney and the Deputy Assistant Attorney General for the Criminal Division at Main Justice to seek the warrant pursuant to a policy aimed at protecting the independence of the press. 2023 WL 7300618, at *10. In *Hiya*, the court found that both the second and third factors strongly weighed in favor of the government; in particular, since Hiya (unlike Chowdhury) was in custody during the entire period in question, the delay did not limit his ability to use his seized devices, and thus the importance of their prompt return was significantly diminished. 2024 WL 5004586, at *4. And in *Kamaldoss*, the court also found the second and third factors strongly weighed in favor of the government. The items seized were packages that the defendants had placed into the stream of commerce by mailing them and which contained illegal drugs, and thus their importance to the defendants was minimal. 2022 WL 12200776, at *16.

Ultimately, this Court (like the government's own agents) is bound to follow the Second Circuit's direction in *Martin*, in which the Court explicitly said nearly three decades ago that it would ordinarily expect a warrant to be procured in "considerably less time" than eleven days to comply with the Fourth Amendment, 157 F.3d at 54, with that holding specifically reaffirmed in *Smith* as recently as 2020. 967 F.3d at 206. And the Second Circuit has further instructed that the Fourth Amendment "demand[s] expediency" on the part of law enforcement to seek a warrant to search a seized item once probable cause has ripened, *see Smith*, 967 F.3d at 206 (quoting *United States v.* Sparks, 806 F.3d 1323, 1340 (11th Cir. 2015)); *id.* at 207.

Thus, the Court finds that the first *Smith* factor — the length of the delay — weighs heavily against the government.

### ii.   *The Importance of the Seized Property*

The next factor the Court must consider is the "the importance of the seized property to the defendant." *Smith*, 967 F.3d at 206.  The Court finds that this factor also weighs heavily against the government.

*Smith* instructs the Court to begin this inquiry by "consider[ing] the nature of the property seized." *Id.* at 207.  Here, Chowdhury has attested (and the government has not disputed) that he used his phone(s) "daily to run [his] grocery business, including banking, communication with suppliers and employees, and keeping track of inventory.   [He] also use[s] [his] phone to do [his] personal banking and communicate with [his] family, including [his] young children who do not live with [him]."  Chowdhury Aff., Chowdhury Mot. Ex. A, ECF No. 279-1 ¶ 20.

*Smith* itself considered the seizure of an electronic tablet, which is not unlike a modern cell phone.  There, the *Smith* court emphasized that the "sheer volume of data that may be stored on an electronic device" like a tablet "raises a significant likelihood that much of the data on the device that has been seized will be deeply personal and have nothing to do with the investigation of criminal activity." *Smith*, 967 F.3d at 207.  Both the Second Circuit and the Supreme Court have recognized the "fundamental distinction between one's ordinary personal effects and one's personal electronic devices." *Id.*; *see, e.g., Riley v. California*, 573 U.S. 373, 393 (2014) (observing that "[m]odern cell phones, as a category, implicate privacy concerns far

beyond those implicated by the search of a cigarette pack, a wallet, or a purse"); *United States v. Ganias*, 824 F.3d 199, 218 (2d Cir. 2016) (en banc) (acknowledging that the "search and seizure of digital media is, in some ways, distinct from what has come before").

The government argues that, while a cell phone may hold personal information, because Chowdhury "[did] not specify which phone held which information," and he did not indicate if he had "alternative electronic devices that could serve the same function," it is unclear that the phones were personally important to him. Gov't Opp. at 72 (first quoting *United States v. Wells*, No. 20-cr-633 (NRB), 2023 WL 2223474, at *9 (S.D.N.Y. Feb. 23, 2023), then quoting *Smith*, 967 F.3d at 208)). However, in *Wells*, the district court was presented with a situation where three phones were seized, and the defendant only owned *one* of them but apparently *used* all three. 2023 WL 2223474, at *4. Thus, the court concluded, it could not have been uniquely important that the one that belonged to him was returned if he could not specify what different information it held than the other two that did not belong to him. *Id.* In this case, Chowdhury's affidavit indicates that both seized phones belonged to him. Thus, *Wells* is not a helpful comparator.

Additionally, while the *Smith* court did find that the second factor weighed in the government's favor, it did so only because the district court made specific factual findings that do not apply here. 967 F.3d at 208 ("[T]he district court here concluded that [the defendant's] testimony about the use and particular significance of the tablet to him was spare in detail, that he had alternative electronic devices that could

54

serve the same functions as his tablet, and that he did not request the return of the tablet."). Thus, the *Smith* court did not fault the defendant for not specifying whether he had alternative devices which could serve the same function, but rather made an affirmative finding that he *did* have those alternative devices. This Court makes no such finding. Additionally, unlike in *Smith*, Chowdhury repeatedly asked for his phones back. *See* June 9 Warrant Aff. ¶¶ 24–25.

Thus, because of the unique properties of a modern cell phone, along with the specific importance of those devices to Chowdhury at the time of the seizure, the Court finds that the second *Smith* factor — the importance of the seized property to the defendant — weighs heavily against the government.

### iii.   *Reduced Property Interest*

The third factor the Court must consider is whether Chowdhury had a reduced property interest in the Blue Phone. The Court finds that this factor is neutral or weighs slightly against the government. The facts in this case bear marked similarities to *Smith* on this point, where the tablet was seized from the defendant's vehicle and was not voluntarily relinquished to police, and the Circuit found that the defendant "did nothing to reduce his property interest by means of consent or voluntarily relinquishing control of his tablet." *Smith*, 967 F.3d at 208. Similarly, Chowdhury did not give law enforcement consent to seize his Blue Phone, and he in fact repeatedly asked for it back. As the *Smith* court noted, this is also unlike *Martin*, where the defendant voluntarily relinquished the property to the control of a third party by mailing it through UPS. *See id.* at 208 n.2 (citing *Martin*, 157 F.3d at 54).

It is true, as the government argues, that the existence of probable cause diminished Chowdhury's property interest in the Blue Phone to at least some extent, as "the Fourth Amendment will tolerate greater delays after probable-cause seizures." *United States v. Burgard*, 675 F.3d 1029, 1033 (2d Cir. 2012). However, "to the extent that [Chowdhury's] possessory interest was offset by the police's probable cause to seize the [Blue Phone], the police's interest was delimited by the obligation to seek a search warrant without unreasonable delay." *Smith*, 967 F.3d at 209. This is because, as in *Smith*, the Blue Phone did not have any "independent evidentiary value that would have justified the police's retention of the [it] without regard to whether they ever sought a warrant to search [its] contents." *Id.* This is not a case where the seized item is "contraband like narcotics that retain[] investigative or prosecutorial value regardless of any further search of its contents." *Id.* The Blue Phone is not in itself contraband, nor evidence of a crime. Rather, its digital contents are where the evidence of criminal activity may be found. The entire reason for the seizure of the Blue Phone was to search its digital contents, and none of those contents could be accessed without a search warrant.

Under *Smith,* the probable cause that diminished Chowdhury's property interest in the Blue Phone only did so as long as it was reasonable for law enforcement hold that device before seeking a warrant. The Court thus concludes that "on balance[,] . . . the third factor (reduced property interest) is either neutral or weighs in [Chowdhury's] favor." *Id.*

iv.  *Justification for the Delay*

The last factor the Court must consider is the justification for the delay in obtaining a warrant.  The government argues that "Chowdhury's Phones were seized in the initial weeks of a rapidly moving ongoing investigation into a serious kidnapping."  Gov't Opp. at 61.  Additionally, at the August 26 hearing, Agent Friedman testified that on June 6, 2023, he submitted an affidavit in support of a search warrant for cell site data for Chowdhury's phone number and John Doe-2's number.  Aug. 26 Hr'g Tr. at 94.  The location data results from that warrant were received on June 8, 2023.  *Id.* at 95.  At oral argument, the government contended that the continuing investigation and Agent Friedman's work in preparing the cell site data warrant explained, and thereby justified, the delay.  *See* Sept. 10 Hr'g Tr. at 376.

However, neither of those justifications stands up to scrutiny.  First, besides a general reference to this being a complicated and "rapidly moving ongoing investigation," the government did not provide any specifics action that were being undertaken by law enforcement which justified the delay in obtaining the June 9 Warrant, except for the fact that Agent Friedman applied for the cell site data warrant on June 6.  The government cites to *United States v. Corbett* for the proposition that this delay was reasonable "in light of the government's continuing investigation."  *See* Gov't Opp. at 72 (quoting *United States v. Corbett,* No. 20-cr-213 (KAM), 2021 WL 4480626, at *6 (E.D.N.Y. Sept. 30, 2021).  However, the Court in *Corbett* was specifically referring to an ongoing investigation which led to *new*

57

*evidence* being gathered between the initial seizure and the warrant application — evidence that was then *relied upon* in the warrant application. *Corbett*, 2021 WL 4480626, at *6. In fact, the warrant affidavit in *Corbett* specifically informed the magistrate judge that "the investigation of this case continued after the seizure of the Devices, making it reasonable to delay applying for a warrant so that newly discovered evidence could be including in the warrant application," and then directed the magistrate judge to exactly what that newly discovered evidence was in order to explain the cause of the delay. *Id.* (internal quotation marks omitted).

Here, there appears to be no information in the June 9 Warrant Affidavit that was not known to Agent Friedman on May 31, 2023, the day the Blue Phone was seized. Thus, a general reference by the government's lawyers to the "ongoing investigation" is not a justification for the delay.

The cell site data warrant that Agent Friedman applied for on June 6 is, indeed, a specific investigatory step that was taken between the seizure of the Blue Phone and the June 9 Warrant. But it is unclear why it is a justification for the delay. The location information from that warrant was received on June 8, 2023, but it was not referenced in the June 9 Warrant Affidavit. In fact, cell site location data was not referenced anywhere in the June 9 Warrant Affidavit. While it is theoretically possible that Agent Friedman was waiting for the results of the cell site data to see *if* it should be included in the June 9 Warrant Affidavit, and after receiving them he decided against it, Agent Friedman did not testify as such. Nowhere in Agent Friedman's testimony can this Court even find a suggestion that he was awaiting the

58

results of the cell site data before he applied for the June 9 Warrant to search Chowdhury's seized phones.  Thus, the Court will not speculate that this was somehow a reason for the delay.

Accordingly, the June 6 Warrant for cell site data is a justification for the delay only insofar as it is a specific example of other work on the case that Agent Friedman conducted between May 31, 2023, and June 9, 2023.  This, however, is a weak justification for delay.  As the Second Circuit explained in *Smith*:

> [T]he Fourth Amendment imposes a time-sensitive duty to diligently apply for a search warrant if an item has been seized for that very purpose, and all the more so if the item has been warrantlessly seized. The police may not overlook this duty to attend to other matters for which the Constitution imposes no such time-sensitive duty unless there are important reasons why other matters must take priority.

967 F.3d at 210.  Agent Friedman did not testify as to any reason why preparing the June 6 warrant seeking cell site data — a task "for which the Constitution imposes no such time-sensitive duty," *id.* — needed to take priority over the June 9 Warrant application to search Chowdhury's phones.  Thus, the Court finds that the fourth *Smith* factor — the justification for the delay — weighs heavily against the government.  *See also United States v. Tisdol*, 544 F. Supp. 3d 219, 227 (D. Conn. 2021) (finding that a delay of 34 days, combined with a "complete lack of explanation" as to why the warrant was not sought earlier, was unreasonable, "particularly when [the Fourth Amendment's] requirements had been so recently and expressly clarified by the Second Circuit in *Smith*").

For the foregoing reasons, because the Court finds that every *Smith* factor is either neutral or weighs against the conclusion that the delay in seeking a search

warrant for Chowdhury's seized phones was reasonable.  Nor has the government pointed to any "overriding circumstances" that would otherwise justify the delay.  *Id.* at 211.  Thus, the delayed search of Chowdhury's phones was unreasonable and in violation of the Fourth Amendment.

### v. *The Exclusionary Rule*

Even if the delay in seeking a search warrant to search Chowdhury's phones was unreasonable under the Fourth Amendment, it does not automatically follow that the fruits of the searches should be suppressed.  "[T]he exclusionary rule is a judicially-created mechanism of safeguarding against unreasonable searches and seizures — violations of the Fourth Amendment — primarily through its deterrent effect."  *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020) (per curiam).  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Herring v. United States*, 555 U.S. 135, 144 (2009).  On the other hand, "the application of the exclusionary rule is not appropriate for constitutional violations that are the product of isolated simple negligence."  *Smith*, 967 F.3d at 211–12.

The Court finds no evidence that the government's delay in seeking the June 9 Warrant was the product of deliberate or reckless behavior.  Nor is there any indication that the delay was intended to afford the government some sort of strategic advantage.  *See Smith,* 967 F.3d at 212 ("the record does not show that [the officer] acted with a deliberate intend to violate Smith's rights or that it was reckless or

60

grossly negligent for [the officer] to allow a month to slip by before applying for a search warrant"); *cf. United States v. Fox*, No. 23-cr-227 (NGG), 2024 WL 3520767, at *20 (E.D.N.Y. July 24, 2024) (finding that the exclusionary rule applied when the violation appeared to be a "deliberate, tactical choice" (quoting *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013)). Rather, from this Court's review of the evidence, as well as its observations of Agent Friedman during his testimony, it concludes that the delay was a result of negligence on the part of the government.

However, whether that negligence can be defined as "simple" negligence or "gross" negligence — the latter of which would require exclusion — is a much more difficult question. In this regard, the Court is aware that its "good-faith inquiry is confined to the objectively ascertainable question [of] whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances." *Herring*, 555 U.S. at 145 (internal quotation marks omitted). Thus, this Court's task is to determine whether a reasonably well-trained officer in Agent Friedman's position would have known that the nine-day delay — when no other circumstances prevented, or even made it difficult, for the government to seek a warrant in less time — was a violation of Chowdhury's Fourth Amendment rights.

In *Smith*, the Second Circuit made clear that it expected the government to pay attention to the mandates of its precedents and train its agents on how to avoid a finding of unreasonable delay under the Fourth Amendment going forward. *See Smith*, 967 F.3d at 213 ("[W]e have stated and clarified principles above that shall guide law enforcement officers with respect to what circumstances establish an

unreasonable delay under the Fourth Amendment.").  That body of law includes the *Martin* Court's clear statement (re-affirmed in *Smith*) that, in most cases, the Circuit would "expect police officers to secure a search warrant in considerably less time than" eleven days.  *Smith*, 967 F.3d at 206 (quoting *Martin*, 157 F.3d at 54); *see also Tisdol*, 544 F. Supp. at 227–28 (noting that in *Smith,* "the Second Circuit explicitly put law enforcement on notice that month-long, unjustified delays will no longer be tolerated," and suppressing evidence where police offered no justification for 34-day delay in seeking warrant).

Here, when seizing Chowdhury's phones 24 years after *Martin* was decided, and less than three years after *Smith* both reaffirmed *Martin* and underscored the heightened property interests in the prompt return of citizens' electronic devices, the government waited a full nine days to seek a warrant.  And it has offered no real justification — much less a persuasive one — for that delay.  The government's actions were thus unreasonable under this Circuit's Fourth Amendment caselaw. Moreover, the fact that the Circuit reminded the government just a few years ago of its obligation to train case agents on this area of law makes it far from easy to determine whether Agent Friedman's actions crossed the line from simple negligence to gross negligence, as is required for this Court to suppress the fruits of an unreasonable search.

It is clear that "an objectively reasonable officer in [Friedman's] position *should* have realized" that the nine-day delay was unreasonable.  *Smith*, 967 F.3d at 212–13 (emphasis supplied).  However, given that no district court in this Circuit had thus

far found a delay of nine days unreasonable (even though every other court to analyze the issue that this Court is aware of found that *other* factors, besides the length of the delay itself, also weighed toward the government in finding the delay reasonable), this Court cannot say with confidence "that an objectively reasonable officer *would* have known that the delay amounted to a violation of the Fourth Amendment." *Id.* at 213 (emphasis supplied).  Thus, the Court does not find that Agent Friedman's actions constituted *gross* negligence rather than simple negligence, and the exclusionary rule does not apply to the fruits of the search of Chowdhury's phones. *See Davis v. United States*, 564 U.S. 229, 238 (2011) (holding that when police "conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way" (internal quotation marks and citation omitted)).

### b.  Probable Cause in the June 9 Warrant Affidavit

Chowdhury next argues that the fruits of any search pursuant to the June 9 Warrant should be suppressed because (1) the warrant application itself lacked probable cause that Chowdhury or his phones were linked to the alleged criminal activity, and (2) the only statement linking Chowdhury to the criminal activity contained a materially misleading omission.  Chowdhury Reply at 29–37.

Whether the four corners of the warrant application (as opposed to the other evidence gathered as of June 9, much of which Agent Friedman did not include in his affidavit) established probable cause that Chowdhury himself was a perpetrator of John Doe-2's kidnapping is far from clear.  But the Court need not and does not

answer that question, as the search pursuant to the June 9 Warrant was covered by the good faith exception to the exclusionary rule, in that Agent Friedman was entitled to rely on the magistrate judge's determination that probable cause was present to execute the warrant thereafter.

i. *Probable Cause*

It is undisputed that a neutral magistrate reviewed the June 9 Warrant Affidavit and determined there was probable cause to search Chowdhury's phones for evidence of criminal activity. This Court must "accord substantial deference to the finding of an issuing judicial officer that probable cause exists." *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019) (internal quotation marks omitted); *see also McLane Co. v. EEOC*, 581 U.S. 72, 84 (2017) ("[C]ourts should pay great deference to a magistrate judge's determination of probable cause . . . ." (internal quotation marks omitted)). When this Court evaluates that probable cause determination, it must confine its review to the information provided "within the four corners of a written affidavit." *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) (quoting *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006)).

If the June 9 Warrant Affidavit put forth probable cause that Chowdhury was involved in the kidnapping of John Doe-2, then it certainly contained probable cause that his cell phones may contain evidence of that crime. This is so for largely the same reasons as the Court found that Agent Friedman had probable cause to believe Chowdhury's cell phones contained evidence of criminal activity as of May 31, 2023. For instance, the Affidavit indicated that "the Victim recalled Chowdhury using a

64

cellular telephone" and that his training and experience led him to "know that persons who conspire to and commit kidnappings frequently communicate with coconspirators using electronic devices." June 9 Warrant Aff. ¶ 28. For the reasons already outlined, the fact that John Doe-2 could not identify the specific phone used to film him is not dispositive to the question of whether Chowdhury had evidence of the kidnapping on *any* of his phones, due to the common-sense inferences that can be drawn from the nature of the crime, the multiple perpetrators who may have been coordinating with one another, and so forth.

The much more difficult question, however, is whether the June 9 Warrant Affidavit set forth sufficient specific facts to establish probable cause that *Abu Chowdhury* was one of the men involved in the alleged abduction of John Doe-2. For reasons that remain unexplained, virtually all the information that Agent Friedman testified to at the suppression hearing regarding the steps taken, and facts gathered, in the investigation which led the agents to believe that they had correctly identified Chowdhury himself as one of John Doe-2's assailants were absent from the June 9 Warrant Affidavit. For example, the June 9 Warrant Affidavit did not include the assertions that John Doe-2 stated that one of the kidnappers had the last name Chowdhury, or that he referred to himself as the "King of New York" and Chowdhury had social media handles with variations on the "King of New York" moniker, or that Abu Chowdhury had filed the complaint for Iffat Lubna's lost passport, or that video surveillance of the crime captured an individual who had the same facial hair and build as Chowdhury.

65

Instead, the June 9 Warrant Affidavit contains a detailed recitation of the gruesome factual allegations about the kidnapping itself as reported by John Doe-2, including the date and location from which he was abducted, the locations where he was held, the physical assaults and threats he endured, and how he managed to escape and flee to safety.  *See* June 9 Warrant Aff. ¶¶ 9–21.  And while the Affidavit describes in detail various criminal actions attributed specifically to "Chowdhury" during the kidnapping, it provides remarkably little detail or information as to why or how Agent Friedman had reached the conclusion that Chowdhury was, in fact, the person who did these things.   Instead, the Affidavit simply states that, "[a]t approximately 1:00am on May 11, 2023, a male wearing white shorts and white hooded sweatshirt with a black circular logo on the back, *later identified to be Chowdhury*, approached [John Doe-2]."  June 9 Warrant Aff. ¶ 9 (emphasis supplied). From that moment forward, the Affidavit then simply refers to that "male" individual as Chowdhury, but it never explains *how* he was "identified to be Chowdhury."  That is so even though by that time, Agent Friedman had learned a great deal of information about Chowdhury's residence, social media accounts, DMV records, and physical appearance, much of which (as the Court noted *supra*) specifically supported probable cause — yet he included none of those supporting facts in the Affidavit itself.

The only other category of information in the four corners of the Affidavit that arguably supported the "identification" of Chowdhury as one of the perpetrators of the kidnapping involved his connections to Lubna. The Affidavit describes the online classes that John Doe-2 attended before the kidnapping (including the name of the

school), states that he befriended a female student and "frequently conversed with her online through Microsoft Teams," and that the female student was "later identified as Iffat Lubna." *Id.* ¶ 7.  It proceeds to assert that Lubna was the one who lured John Doe-2 to the location from where he was kidnapped, that she was inside the minivan he was forced to enter, and that she recorded the kidnapping and physical assault on a cell phone while he was being driven away from that location. *Id.* ¶¶ 8, 10.  Later in the Affidavit, Agent Friedman describes Lubna's actions as Chowdhury's front-seat passenger during the traffic stop on May 31.  *Id.* ¶ 22.  He also attaches screenshots of the home screen of Chowdhury's seized phones, which showed "a couple embracing, who appear to be Chowdhury and Lubna."  *Id.* ¶ 26.

Probable cause must be based on "particularized [facts] with respect to" the defendant.  *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).  The conclusory statement that the man who participated in the kidnapping of John Doe-2 was "later identified to be" Abu Chowdhury is not a "particularized fact" linking Chowdhury to the crime.  Nor is the statement that the female student who lured John Doe-2 to the site of the alleged kidnapping was "later identified as Iffat Lubna."  However, given the deference that this Court must afford to the magistrate judge's determination of probable cause, it cannot say that the issuing magistrate could not have reasonably inferred that the above statements, in context and viewed collectively, provided probable cause to identify Chowdhury as the "male" perpetrator.  For that reason, and for the additional reasons set forth below, even if the June 9 Warrant Affidavit lacked probable cause, the good faith exception to the exclusionary rule applies.

67

ii. *Good Faith*

"Even where a warrant was issued without probable cause in violation of the Fourth Amendment, suppression of the evidence is not automatic." *Boles*, 914 F.3d at 103. "[P]olice conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. In the context of law enforcement officers who execute a search pursuant to a judicially authorized warrant, the exclusionary rule will not apply when officers act in "objectively reasonable reliance on [that] subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). "[W]hen an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope, . . . there is [generally] no police illegality and thus nothing to deter." *Id.* at 920–21. However, "[f]or an officer to be able to claim the benefits of the good faith exception, . . . his reliance on a warrant must be objectively reasonable." *Boles*, 914 F.3d at 103.[15]

---

[15] Chowdhury initially requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether a statement in Agent Friedman's June 9 Warrant Affidavit was "made with reckless disregard for the truth." *See* Chowdhury Reply 36–37 (quoting *Falso*, 544 F.3d at 125). The Court granted that request and ordered a *Franks* hearing be conducted during the August 26, 2025 suppression hearing. *See* Docket Order dated August 15, 2025. However, upon hearing the testimony of Agent Friedman and reviewing the parties' submissions, the Court believes that correct manner to analyze Agent Friedman's alleged misrepresentations in the June 9 Warrant affidavit is the good-faith framework *United States v. Leon*, 468 U.S. 897 (1984), rather than under *Franks*.

Chowdhury is challenging Agent Friedman's attestation that the man involved in the kidnapping of John Doe-2 was "later identified to be Chowdhury" as containing

There are four circumstances in which the Court will find that an officer's reliance on a warrant was *not* objectively reasonable, and the good faith exception will thus not apply:

> (1) the magistrate judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;
> (2) where the issuing magistrate wholly abandoned his judicial role;
> (3) a warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
> (4) a warrant is so facially deficient that officers cannot reasonably presume it to be valid.

*United States v. Jones*, 43 F.4th 94, 111 (2d Cir. 2022) (internal quotation marks omitted).  The Court does not find that any of the last three exceptions to the good faith requirement apply.  While the issue of whether the warrant made out probable cause may be close, it was not so "facially deficient" or devoid of detail that a

---

a material omission.  *See* June 9 Warrant Aff. ¶ 9.  In order for this to be a *Franks* issue, "the alleged falsehoods or omissions [must have been] necessary to the judge's probable cause finding."  *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).  In this instance, as discussed *supra*, the Court is not convinced even *with* this statement that the four corners of the June 9 Warrant Affidavit make out probable cause.  Thus, the Court must determine whether it was reasonable for Agent Friedman to rely on a warrant that was arguably not supported by probable cause.  *See Leon*, 468 U.S. at 922.

The distinction between a *Leon* good-faith analysis and a *Franks* analysis is porous and far from a bright line.  However, it is largely an academic distinction in this case.  This is because whether the Court considers this a *Franks* issue or a good faith issue, the question it must answer is fundamentally the same.  Under a *Franks* analysis, the Court considers whether "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth," *Salameh*, 152 F.3d at 113, and under a good faith analysis, the Court considers whether the affiant included information he "knew was false or would have known was false except for a reckless disregard for the truth," *Leon*, 468 U.S. at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

reasonable officer could not have believed it to be valid. This exception is reserved for cases like *In re 650 Fifth Avenue and Related Properties*, where the warrant did not even "include a reference to the Claimants' alleged crimes or a temporal scope for the items to be seized." 934 F.3d 147, 163 (2d Cir. 2019). Nor was any evidence presented that the issuing judge "wholly abandoned his judicial role." *Jones*, 43 F.4th at 111 (2d Cir. 2022) (internal quotation marks omitted).

In this Court's view, Chowdhury has made a strong argument that the conclusory statement about his "identification," unsupported by virtually any of the investigative information that Agent Friedman later testified to at the suppression hearing, was insufficient to provide the magistrate judge with the sort of particularized facts related to his alleged identity as the perpetrator that the Fourth Amendment demands. However, reviewing the warrant affidavit as a whole, the Court does not find that it was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Jones*, 43 F.4th at 111 (internal quotation marks omitted). "This issue 'most frequently arises when affidavits are bare bones' — that is, when they are 'totally devoid of factual circumstances to support conclusory allegations.'" *Id.* at 112 (quoting *United States v. Clark*, 638 F.3d 89, 103 (2d Cir. 2011)). And the Second Circuit has made clear that is a "a very difficult threshold to meet." *Falso*, 544 F.3d at 128 n.24.

The June 9 Affidavit did note that Chowdhury was "identified" by investigators as a participant in the criminal activity, and specifically as the man wearing white shorts and a white hooded sweatshirt at the scene of the abduction.

70

June 9 Warrant ¶ 9.  It also connected him to the scheme by virtue of his ties to Lubna, the alleged female kidnapper who lured John Doe-2 to the scene.  The Affidavit described Lubna's own prior connections to John Doe-2 through their shared online classes, and the fact that they had previously communicated through the school's Microsoft Teams accounts.  *Id.* ¶ 7.  While it does recite, in a conclusory fashion, that the female student was merely "identified" as Lubna without saying *how* the investigators did so, *id.*, it would not have been unreasonable for the magistrate judge to infer that she was "identified" through investigative means that specifically linked her to, for example, the Teams account registered in her name for those very online classes.  The Affidavit then proceeds to connect Chowdhury to Lubna by explaining that he was in the car with Lubna when he was stopped on May 31, *id.* ¶ 22, and that his phones' home screens each showed a photograph of the two embracing, *id.* ¶ 26.  Ultimately, then, this Court cannot say that the Affidavit was so "lacking in indicia of probable cause" as to have made it "entirely unreasonable" for Agent Friedman to rely on the magistrate judge's issuance of the warrant.

      *iii.*    *Whether the "identified" statement contained a material omission*

The Court now turns to Chowdhury's remaining challenge to the warrant: whether the statement that the man involved in the kidnapping who was "later identified to be Chowdhury" was misleading, and, if so, whether Agent Friedman knew it was.  After hearing Agent Friedman's testimony and reviewing the Affidavit itself, the Court does not find that this statement was misleading, nor that any misleading information was knowingly or recklessly provided to the magistrate judge.

Chowdhury asserts that this "later identified to be Chowdhury" statement in the Affidavit must have been referring to John Doe-2's identification of Chowdhury during the police-arranged photo array, during which he (1) identified Chowdhury's photo as one of his kidnappers, and (2) indicated that he was "50%" certain in that identification.  Chowdhury Reply at 36 (citing FBI 302A).  Chowdhury argues that Agent Friedman's failure to inform the magistrate judge that the identification was only made with 50% confidence was a "critical omission" that was "made with a reckless disregard for the truth."  *Id.*

However, the clause "later identified to be Chowdhury" does not necessarily refer to a witness identification.  During the August 26 hearing, Agent Friedman testified that he did not include the 50% confidence admission in the Affidavit because the Affidavit "didn't discuss [the] photo lineup identification."  Aug. 26 Hr'g Tr. at 98.  It is just as likely that the clause referenced Agent Friedman's *own* belief that the FBI had identified the man observed on the surveillance video in "white shorts and a white hooded sweatshirt," June 9 Warrant Aff. ¶ 9, as Abu Chowdhury.  As discussed *supra*, at the hearing, Agent Friedman detailed the multiple ways — including but not limited to the photo lineup — that his investigation led him to "identify" the individual who perpetrated the alleged kidnapping as Abu Chowdhury.

Thus, the Court does not find that Agent Friedman omission of the 50% confidence assessment was a result of him knowingly or recklessly misleading the magistrate judge about the circumstances surrounding the photo array.  Instead, the Court credits Agent Friedman's assertion that the reason he did not include the 50%

confidence statement by John Doe-2 during the photo array was because he was not specifically referring to the photo identification, but instead to the investigators' own assessment based on the entire investigation to date.[16]

It is true that Agent Friedman did not include the numerous additional details from his investigation that led him to conclude that Chowdhury was the man who identified himself as the "King of New York" during John Doe-2's kidnapping. Without these additional details, the Affidavit is extremely light on probable cause as to Chowdhury's identification. But that is a different question than whether Agent Friedman knowingly or recklessly misled the magistrate judge. After hearing Agent Friedman's testimony, including all the steps he took and information he learned upon which he based his own determination of probable cause, this Court does not find that his omission of the 50% confidence statement by John Doe-2 was a knowing or reckless attempt to mislead.

As such, regardless of whether the June 9 Warrant Affidavit sufficiently established probable cause, the fruits of the search that Agent Friedman conducted

---

[16] In any event, had Agent Friedman included the fact that John Doe-2 only made his identification with 50% confidence, it is unclear that this would have vitiated probable cause. First, "[P]robable cause does not demand any showing that a good-faith belief be 'correct or more likely true than false.'" *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). Thus, an identification made with 50% confidence could very well have supported a finding of probable cause, rather than undermined it. Second, it has been recognized that self-reported confidence of an eyewitness identification is not necessarily correlated to accuracy. *See Perry v. New Hampshire*, 565 U.S. 228, 264 (2012) (Sotomayor, *J.*, dissenting) ("Study after study demonstrates . . . that jurors place the greatest weight on eyewitness confidence in assessing identifications *even though confidence is a poor gauge of accuracy* . . . ." (footnotes omitted) (emphasis supplied) (collecting studies)).

after the warrant was issued are not subject to suppression. *See Falso*, 544 F.3d at 125 ("[T]he exclusionary rule . . . does not apply to evidence seized in objectively reasonable reliance on a warrant . . . .") (internal quotation marks omitted)).

c. Scope of the Search Pursuant to the June 9 Warrant

Chowdhury argues that even if the warrant to search the Blue Phone was valid, Agent Friedman's manual search of the phone, which provided the basis for the August 4, 2023 Warrant Affidavit, *see* Aug. 4 Warrant Aff. ¶ 24, was conducted outside the authorized scope of the June 9 Warrant. *See* Chowdhury Reply at 37–40.

The June 9 Warrant authorized the government to search the Blue Phone only for digital records related to John Doe-2's kidnapping, including videos, photographs, text messages, and location data, between May 11 and May 13, 2023. *See* June 9 Warrant Att. B. In conducting a manual search of the phone, Agent Friedman opened the "photos" application to "search[] for photos taken May 11–13." Blue Phone 302 at 2. However, when the application opened, it immediately displayed thumbnails for four photo albums. *Id.* One of the thumbnails was a photo of John Doe-1, an alleged victim in a separate kidnapping Agent Friedman was investigating. *Id.* The photo also had a "masked individual wearing black gloves" sitting next to John Doe-1. *Id.* It is undisputed that this photo was outside of the scope of the June 9 Warrant.

Chowdhury argues that by conducting a manual, rather than digital or forensic, search of the Blue Phone, Agent Friedman artificially created circumstances so that he would see material that fell outside of the scope of the June 9 Warrant in "plain view." *See* Chowdhury Reply at 37–40. The Court disagrees.

74

The Fourth Amendment requires that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. However, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by a warrant — subject of course to the general Fourth Amendment protection against unreasonable searches and seizures." *Dalia v. United States*, 441 U.S. 238, 257 (1979) (internal quotation marks and footnote omitted). And if police officers are executing a warrant and they see an object in plain view that was outside of the scope of the warrant — but that object is contraband or contains evidence of a crime — they can seize it under the "plain view" doctrine. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

The Second Circuit has recognized that this plain view doctrine poses particular difficulties when it comes to searches of electronic devices. For example, in *Ganias*, the Circuit recognized that "files" in a digital sense are not the same as in a physical sense, as they may be interspersed "throughout a digital storage medium," which "may affect the degree to which it is feasible, in a case involving a search pursuant to a warrant, to fully extract and segregate responsive data from non-responsive data." 824 F.3d at 213. In *United States v. Galpin*, the Circuit warned of the dangers of a search of electronic devices, noting that "[o]nce the government has obtained authorization to search [a] hard drive, the government may claim that the contents of every file it chose to open were in plain view . . . , even if they implicate the defendant in a crime not contemplated by the warrant." 720 F.3d 436, 447 (2d

75

Cir. 2013). The Second Circuit is not alone in its concerns. *See, e.g.*, *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (per curiam) ("By necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there."), *overruled in part on other grounds as recognized by Demaree v. Pederson*, 887 F.3d 870, 876 (9th Cir. 2018) (per curiam).

However, at least thus far, the Second Circuit has explicitly declined to require that law enforcement deploy any particular protocols when executing a warrant authorizing the search of a digital device. *See Galpin*, 720 F.3d at 451 ("Unlike the Ninth Circuit, we have not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants, and we do not impose any rigid requirements in that regard at this juncture."); *cf. United States v. Ulbricht*, 858 F.3d 71, 104 (2d Cir. 2017) ("A future case may require this Court to articulate special limitations on digital searches to effectuate the Fourth Amendment's particularity or reasonableness requirements. Such a case is not before us."), *overruled on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018). On the other hand, simply because the Circuit has not set down specific protocols for exactly how agents must execute a warrant to search a digital device, they do not have *carte blanche* to execute a warrant in a way which unduly risks exposing them to material outside the scope of the warrant. Law enforcement's search of an electronic device must still be reasonable. Thus, the Second Circuit has directed district courts, when reviewing a "plain view" issue of a search of an electronic device,

to "take into account the degree, if any, . . . [the] digital search protocols *target* information outside the scope of the valid portion of the warrant." *Galpin*, 720 F.3d 451 (emphasis supplied).

The evidence provided at the August 26 hearing supports a finding that Agent Friedman was not *targeting* information outside of the scope of the warrant. It includes the following:

There are different ways that law enforcement can search a cell phone.  One way, and perhaps the most obvious, is a manual search: simply scrolling through and looking at the phone, clicking into different applications, as any individual would. Aug. 26 Hr'g Tr. at 102.  Another way to extract the information from the phone is to use a "forensic tool in order to process it into a more human readable format," *i.e.*, a "forensic review."  *Id.* at 167.  In this particular case, the program that the FBI uses to create the human readable format is called "Cellebrite."  *Id.* at 102.  Because a forensic review does not require a human to first look at the data in order to sort it, it can be used to separate out responsive and non-responsive material prior to law enforcement's review.  *Id.* at 117.  Thus, had the FBI used Cellebrite to search the Blue Phone, it could have segregated the responsive data from May 11–13 from everything else on the phone, making only the former available to Agent Friedman.

Upon receiving the June 9 Warrant, Agent Friedman submitted both the Red Phone and the Blue Phone to the Computer Analysis Response Team ("CART").  *Id.* at 102.  CART was "able to crack . . . the [R]ed [P]hone with their software and create an extraction, but they were unable to do so with the [B]lue [P]hone."  *Id.*  FBI Digital

77

Forensic Examiner Alexandra Cottone testified that the two phones were different iPhone models, *id.* at 173, and while she was able to perform an extraction of the Red Phone without its password, attempting to do so on the Blue Phone could result in inadvertently restarting the phone, which would impact the amount of data that could be recovered. *Id.* at 176. When she informed Agent Friedman of this risk, he directed her to halt any forensic extraction of the Blue Phone. *Id.*

On July 12, 2023, through investigative means, Agent Friedman came up with an idea of what the password to the Blue Phone may be. *Id.* at 103. Agent Friedman sent that password to the CART office, and they told him that the password worked. *Id.* at 105. Here, Examiner Cottone's and Agent Friedman's testimony diverge somewhat. Agent Friedman testified that he was told by CART that they did not have a version of Cellebrite which could conduct an extraction, even with the password. *Id.* at 103. Examiner Cottone, on the other hand, testified that, as of July 12, 2023, CART could in fact complete a full forensic file extraction of the Blue Phone once the password was identified. *Id.* at 181. Examiner Cottone could not have told Agent Friedman that information on July 12, however, because she was away at a training and did not have access to her email. *Id.* at 177. Thus, while the Court certainly credits Examiner Cottone's testimony that a full extraction of the Blue Phone was possible on July 12, the Court does not believe Agent Friedman was insincere about his belief that an extraction was not possible; he was simply mistaken. *Id.* at 103. This conclusion is further supported by the fact that on July 27, 2023, weeks after Agent Friedman's initial manual search of the Blue Phone, he

emailed CART, asking if they were "able to do an extraction using the [password,] or[,] even though we have the [password], [is] CART[] still waiting on an updated tool for newer IOS versions?"  *Id.* at 128.  Thus, the Court credits Agent Friedman's testimony that on July 12, 2023, he believed (even if incorrectly) that an extraction of the Blue Phone was impossible, even with the password.

Accordingly, when Agent Friedman was told that the password worked and the Blue Phone was unlocked, he went to the CART office and accessed the phone to conduct a manual search.  *Id.* at 105.  He went to the photo application because "[p]hotos are displayed chronologically.  You can scroll through and the photos fly by until you get to a particular date."  *Id.*  However, when he opened the application, it immediately displayed albums, one of which had a thumbnail of a picture that was taken from outside the scope of the warrant, but displayed John Doe-1, the victim of a different alleged abduction, next to an individual in black gloves and a mask.  *Id.* at 107.  Agent Friedman testified that because this was outside the scope of the warrant, he "paused his review" at that point, but took a screenshot — which he used in the August 8 Warrant Affidavit.  *Id.* at 107–08.[17]

---

[17] At the hearing, defense counsel introduced Cellebrite evidence which indicated that other applications beside the Photos app were unlocked during Agent Friedman's manual search on July 12, 2023.  *See* Aug. 26 Tr. at 189–91 (showing activity in the applications "Mobile Slideshow, Peekaboo, Facebook Messenger, Instagram, and WhatsApp").  It appears that the longest time any other application was running was approximately two minutes, and some ran for as few as 16 seconds.  Def. Hr'g Ex. U at 4.  When asked if he remembered accessing any applications besides the "photos," Agent Friedman said he did not.  Sept. 10 Hr'g Tr. at 346.  Although Friedman had earlier testified that he only accessed the Photos app on July 12, defense counsel did not ask for an adverse credibility finding on this point, *see id.*

The chain of events described above does not establish that Agent Friedman purposefully chose to use a less precise method of searching the phone to "accidentally" see non-responsive material in plain view.  Rather, it is consistent with the actions of an FBI Special Agent who, in the midst of an ongoing kidnapping investigation, held the mistaken belief that forensic extraction of a phone was not possible, and thus proceeded with a manual search.  It would certainly have been better practice for him to have confirmed his understanding about the forensic limitations of the search with Cottone's supervisor, or any other member of the CART team, before he took it upon himself to do the manual search in Cottone's absence.  But the search was not an unreasonable execution of the June 9 Warrant, as he did not knowingly or recklessly "target information outside the scope of the valid portion of the [W]arrant."  *Galpin*, 720 F.3d at 451.

There may come a time when the Second Circuit "require[s] specific search protocols," or directs law enforcement to determine whether such protocols are feasible before performing a search, to reduce the (not-insignificant) risk that agents will exceed the scope of a digital search warrant when conducting a manual search of a cell phone or other electronic device that contains such a significant trove of personal data.  But under current law, and given the specific circumstances presented here, Agent Friedman's manual search of the Blue Phone was not outside the scope of the warrant or otherwise unreasonable.  *Id.*

---

at 395, and the Court does not make one; it appears he simply did not remember the additional apps he had briefly examined before he viewed the additional "M" photo album and closed the phone.  *See* Aug. 26 Hr'g Tr. at 107.

\*    \*    \*

The Court concludes this lengthy opinion with one final note.  Many of the serious constitutional claims that Chowdhury raised in this motion would never have been at issue if the government had simply presented the evidence of Chowdhury's involvement in John Doe-2's kidnapping to a magistrate judge in the first instance, *i.e.,* had it simply sought a warrant to seize *and* search his electronic devices based on probable cause.  Instead, for reasons that remain unclear, the government chose to stage an entirely pretextual traffic stop for the sole purpose of seizing Chowdhury's phones *without* a warrant.

That choice was not without consequences.  It injected a host of unnecessary variables into the events that followed — for example, whether and when both phones might be in Chowdhury's personal possession during the traffic stop, and whether he would be released from NYPD custody and request the return of his phones before a warrant was in place.  It also put the burden on the government to prove that one or more limited exceptions to the Fourth Amendment's warrant requirement justified the phones' initial seizures *and* their continued retention in the nine days that elapsed before the government finally sought a warrant to search their data.  As a result, the government will now only be able to use some, but not all, of the evidence it recovered from these devices at trial.  Moreover, the data recovered from the warrantless seizure of the Blue Phone barely survived several of the weighty constitutional challenges that Chowdhury brought in this motion, and only because

this Court ultimately concluded that the good-faith exception to the exclusionary rule precludes suppression.

The government had probable cause to believe that evidence of John Doe-2's kidnapping would be found on Chowdhury's devices as of May 31, 2023. It presented no evidence to the Magistrate Judge in the June 9 warrant application that it did not know about nine days earlier, when it seized Chowdhury's phones without a warrant. Accordingly, much of this Court's analysis and the resulting partial grant of Chowdhury's motion could have been avoided if the government had simply taken the constitutionally-prescribed route to seize and search his devices — applying for a judicial warrant — that was readily available to it in May 2023.

## **CONCLUSION**

For the foregoing reasons, the Court DENIES Chowdhury's motion to suppress with regard to the eyewitness identifications and the Blue Phone. The Court GRANTS Chowdhury's motion to suppress with regard to the Red Phone.


    */s/ Nina R. Morrison*
NINA R. MORRISON
United States District Judge

Dated: October 22, 2025
       Brooklyn, New York